**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ARBITRAJE CASA DE CAMBIO, S.A. DE CV.; ASESORIA CAMBIARIA, CASA DE CAMBIO, S.A. DE C.V.; C.B.I. CASA DE CAMBIO, S.A. DE CV.; CASA DE CAMBIO DINEX, S.A. DE C.V.; INTERCAM CASA DE CAMBIO, SA. DE CV.; CASA DE CAMBIO MONEX, S.A. DE C.V.; CASA DE CAMBIO PUEBLA, S.A. DE C.V.; S.C. DIVISAS CASA DE CAMBIO, S.A. DE C.V.; CASA DE CAMBIO TAMIBE, S.A. DE CV.; and CASA DE CAMBIO TIBER, S.A. DE C.V. | ) ) ) ) ) ) | |
| Plaintiffs, | ) | |
| vs. | ) | Case No. 05-217C<br>Senior Judge Smith |
| UNITED STATES POSTAL SERVICE, UNITED STATES POSTAL INSPECTION SERVICE; AND OFFICE OF THE INSPECTOR GENERAL OF THE UNITED STATES POSTAL SERVICE. | ) ) ) | |
| Defendants. | ) | |

**AMENDED COMPLAINT**

COME NOW, Arbitraje Casa de Cambio, S.A. de C.V. (“Arbitraje”), Asesoria Cambiaria Casa de Cambio, S.A. de C.V. (“Asecam”), C.B.I. Casa de Cambio, S.A. de C.V. (“CBI”), Casa de Cambio Dinex, S.A. de C.V. (“Dinex”), Intercam Casa de Cambio, S.A. de C.V. (“Intercam”), Monex Divisas, S.A. de C.V. (“Monex”), Casa de Cambio Puebla, S.A. de C.V. (“Puebla”), SC Divisas Casa de Cambio, S.A. de C.V. (“SC”), Casa de Cambio Tamibe, S.A. de C.V. (“Tamibe”)

and Casa de Cambio Tiber, S.A. de C.V. ("Tiber") (collectively referred to as the "Exchange Houses"), by and through their undersigned attorneys, and amend their Complaint as follows:

## PARTIES

1.

Plaintiff Arbitraje is a foreign corporation duly incorporated and validly existing under the laws of Mexico, with its principal place of business located at Bolivar 795, Mexico City, D.F., 03400, Mexico.

2.

Plaintiff Asecam is a foreign corporation duly incorporated and validly existing under the laws of Mexico, with its principal place of business located at Paseo de la Reforma No. 369, Torre B, Mezzanine, Mexico City, D.F., 06500, Mexico.

3.

Plaintiff CBI is a foreign corporation duly incorporated and validly existing under the laws of Mexico, with its principal place of business located at Av. de los Insurgentes Sur No. 1886, Mexico City, D.F., 01030, Mexico.

4.

Plaintiff Dinex is a foreign corporation duly incorporated and validly existing under the laws of Mexico, with its principal place of business located at Shakespeare 157, Mexico City, D.F., 11590, Mexico.

5.

Plaintiff Intercam is a foreign corporation duly incorporated and validly existing under the laws of Mexico, with its principal place of business located at Rio Tiber No. 63, 2nd floor, Mexico City, D.F., 06500, Mexico.

6.

Plaintiff Monex is a foreign corporation duly incorporated and validly existing under the laws of Mexico, with its principal place of business located at Hamburgo No. 190, Mexico City, D.F., 06600, Mexico.

7.

Plaintiff Puebla is a foreign corporation duly incorporated and validly existing under the laws of Mexico, with its principal place of business located at Av. Juarez No. 2706, City of Puebla, Puebla, 72160, Mexico.

8.

Plaintiff SC is a foreign corporation duly incorporated and validly existing under the laws of Mexico, with its principal place of business located at Paseo de la Reforma No. 116, 16th floor, Mexico City, D.F., 06600, Mexico.

9.

Plaintiff Tamibe is a foreign corporation duly incorporated and validly existing under the laws of Mexico, with its principal place of business located at Insurgentes Sur 575, Mexico City, D.F., 03810, Mexico.

10.

Plaintiff Tiber is a foreign corporation duly incorporated and validly existing under the laws of Mexico, with its principal place of business located at Rio Tiber No. 112, 1st floor, Mexico City, D.F., 06500, Mexico.

11.

Defendant United States Postal Service ("USPS") is an independent establishment of the executive branch of the Government of the United States. In accordance with Rule 4(i)(2) of the Federal Rules of Civil Procedure, the USPS can be served by sending a copy of the summons and complaint by registered certified mail to 475 L'Enfant Plaza, SW, Washington DC 20260-3100, its principal place of business, with additional copies of the summons and complaint sent by registered or certified mail to the Attorney General of the United States at Washington D.C.

12.

Defendant Office of Inspector General ("OIG") of the U.S. Postal Service was authorized by law in 1996. Prior to the 1996 legislation, the Postal Inspection Service performed the duties of the OIG. The Inspector General, who is independent of postal management, is appointed by, and reports directly to, the nine Presidentially appointed Governors of the Postal Service. The OIG primarily investigates and evaluates programs and operations of the USPS to ensure the efficiency and integrity of the postal system. The OIG plays an integral role in maintaining effective programs and operations

in the Postal Service and has the direct responsibility of overseeing the United States Postal Inspection Service.

In accordance with Rule 4(i)(2) of the Federal Rules of Civil Procedure, the OIG can be served by sending a copy of the summons and complaint by registered certified mail to 475 L'Enfant Plaza, SW, Washington DC 20260-3100, its principal place of business, with additional copies of the summons and complaint sent by registered or certified mail to the Attorney General of the United States at Washington, D.C.

13.

Defendant United States Postal Inspection Service ("USPIS") is the primary law enforcement arm of the United States Postal Service responsible for enforcing more than 200 federal statutes that deal with the United States Postal Service and the U.S. Mail. It is responsible for protecting postal employees and the mails; enforcing postal laws; plant and personnel security; conducting various internal audits within the Postal Service; and conducting criminal investigations and presenting evidence to U.S. Attorneys and other prosecutors on these investigations, including performing revenue/financial investigations of theft or embezzlement of postal money orders by other persons where there is no formal contracts, fraud against consumers, business and government (non-postal); crime prevention and security. The Chief Postal Inspector heads the Postal Inspection Service, acts as security officer and defense coordinator for the Postal Service, and maintains liaison with other investigative and law enforcement agencies of the Government and is appointed by and reports to, the Postmaster General of the United States, but is subject to the oversight of the OIG.

In accordance with Rule 4(i)(2) of the Federal Rules of Civil Procedure, the USPIS can be served by sending a copy of the summons and complaint by registered certified mail to 475 L'Enfant Plaza, SW, Washington, D.C. 20260-3100, its principal place of business, with additional copies of the summons and complaint sent by registered or certified mail to the Attorney General of the United States at Washington. D.C.

14.

The Exchange Houses are all financial institutions duly licensed by the federal government of Mexico to perform in an habitual and professional manner, transactions for the purchase, sale and exchange of foreign currencies, including those made through electronic transfer or transmission of funds, with the general public within the Mexican territory, and are organized as limited liability corporations in Mexico, where they maintain their respective principal places of business. The exchange houses are principally engaged in the business of purchasing and selling various forms of currency, as well as negotiable and non-negotiable instruments. Pursuant to Federal Rule of Civil Procedure 20(a), each of the Exchange Houses is properly joined in this suit because their assertions of a right to relief arise out of similar transactions or occurrences, and because common questions of law or fact will arise in this action.

15.

Defendants USPS, USPIS and OIG are liable for damages to each of the Exchange Houses for the reasons set forth, *infra*.

## JURISDICTION

16.

Plaintiffs hereby incorporate each and every allegation contained in paragraphs 1-15 of the Complaint as if fully set forth herein.

17.

In accordance with the provisions of the Postal Reorganization Act of 1970, 39 U.S.C. § 401 et seq. ( "PRA"), the USPS has, among others, the power to sue and be sued in its official name and to settle and compromise claims by or against it. Section 409 of the PRA provides that United States District Courts have original jurisdiction over all actions brought against the USPS.

## VENUE

18.

Plaintiffs hereby incorporate each and every allegation contained in paragraphs 1-17 of the Complaint as if fully set forth herein.

19.

Venue is proper pursuant to 28 U.S.C. §1391. All Defendants have their principal place of business located at 475 L'Enfant Plaza, SW, Washington, D.C. 20260-3100. Furthermore, the great majority of the actions taken by, or on behalf of, the Defendants took place in the District of Columbia, or in the immediate metropolitan area of the District of Columbia. Most of the individuals acting on behalf of the Defendants are based in or near the District of Columbia.

## FACTS

20.

Plaintiffs hereby incorporate each and every allegation contained in paragraphs 1-19 of the Complaint as if fully set forth herein.

**United States Postal Service Money Orders**

21.

The USPS is a quasi-private United States agency which was established pursuant to the PRA to engage in commercial and business transactions with the public.

22.

As part of its commercial activities, the USPS issues both domestic and international money orders for fees.

23.

According to the applicable definition: i) "Money order" means a U.S. Postal Money Order; ii) "Federal Reserve Bank" means a Federal Reserve Bank or branch thereof that presents a money order for payment by the postmaster general; iii) "Presenting bank" means a bank that presents a money order to and receives credit for the money order from a Federal Reserve Bank; iv) "Examination" includes examination of money orders for indicia of theft, forged endorsements, forged signatures or initials of issuing employees, raised amounts, and other material defects by electronic methods and visual inspection for defects that cannot be discovered electronically; and v) "Reclamation" means the action taken by the postmaster general to obtain refund of the amounts of paid money orders.

24.

Such money orders constitute debt obligations of the USPS and, in accordance with international law, United States law and USPS regulations, are required to be paid through the Federal Reserve System upon proper presentment by the holder.

25.

According to the provisions of the USPS's Domestic and International Mail Manuals, which contain the USPS's regulations and are conceived, conceptualized, drafted, and amended according to the dictates of the USPS in Washington, D.C., and formatted and published by the Government Printing Office in Washington, D.C., all money orders are forwarded through the Federal Reserve System, to which commercial banks have access (the USPS is, in fact, bound by the Federal Reserve's regulations).

26.

Postal money orders are injected into the stream of commerce by the USPS for its own benefit, and compete directly with privately issued money orders, cashier's checks, or teller's checks. Postal money orders further mimic these other instruments in that they provide immediately available funds to the holder/endorsee. The nature of postal money orders paired with the pure commercial interest of the USPS in issuing these money orders renders them the functional equivalent of privately issued money orders, cashier's check or teller's checks.

27.

As part of the standard procedures and tasks to process money orders for payment, all money orders are forwarded through the Federal Reserve Banking System, to which commercial banks have access.

28.

Within a "reasonable time", provisional credit is given to the Federal Reserve Bank when it furnishes the money orders for payment by the Postmaster General. Money orders are deemed paid only after examination is completed, subject to the Postmaster General's right to make reclamation.

29.

According to the Domestic and International Mail Manuals, the Postmaster General has the usual right of a drawee to examine money orders presented for payment by banks through the Federal Reserve System and to refuse payment of money orders, and is provided a reasonable time after presentation in order to make each such examination.

**USPS Procedures for Addressing Stolen Money Orders**

30.

A money order is considered "stolen" when it is stolen from a post office, classified or contract station or branch, or a USPS employee before it is officially issued by the post office, classified or contract station or branch, or by a USPS employee discharging his or her official duties and normally reported as such by various distribution means, through the "FRAUD ALERT OF MISSING U.S. MONEY ORDER FORMS" regularly published by the USPS.

31.

Under the Domestic and International Mail Manuals, the Postmaster General has the right to make reclamation, that is, to demand refund from the presenting bank of the amount of a paid money order if, within a reasonable time after payment, the money order is found to be stolen, or to have a forged or unauthorized endorsement, or to contain any material defect or alteration.

32.

Under the Domestic and International Mail Manuals the Postmaster's right to make a reclamation of money orders paid includes, but is not limited to, the right to make reclamation of the amount by which a genuine money order, with a proper and authorized endorsement, has had its face amount wrongfully increased.

33.

Under the Domestic and International Mail Manuals, the Postmaster's right must be exercised within a reasonable time after the Postmaster General discovers that the money order is stolen, bears a forged or unauthorized endorsement, or is otherwise defective. This imposes the necessary duty of due diligence upon the Postmaster General, and also upon the OIG and the USPIS to investigate any fraudulent schemes or criminal activities involving postal money orders.

34.

Under the Domestic and International Mail Manuals, when the beneficiary of a U.S. Postal Service money order notifies the purchaser of that money order that he never received the money order, or that the endorsement on the money order was altered or forged, then the purchaser of said money order can contact the United States Postal Service, which is based in Washington, D.C., and demand a refund.

35.

Under the Domestic and International Mail Manuals, the purchaser of a money order can initiate the refund process, upon notification of the possibility of theft or forgery regarding the money order by requesting a 6401 review.

36.

A 6401 review involves the necessary, obvious and complete examination of the money order at issue, in order to determine that the endorsement is not that of the money order's intended payee or beneficiary.

37.

Once the 6401 review is complete, the purchaser and the payee must fill out and complete a form 306, which provides for the refund of the money order.

38.

The form 306 operates as an affidavit by the purchaser of the original postal money order attesting to the theft or forgery.

**Mexican Commercial Law Governing Payment Instruments**

39.

The Mexican law governing all payment instruments, the General Law of Securities and Credit Operation (Ley General de Titulos y Operaciones de Credito (LGTOC)) is similar to its American counterpart, the Uniform Commercial Code.

40.

Under Mexican law, payment instruments (títulos de crédito) are those documents necessary to exercise the rights which are literally consigned in said documents.

41.

Under Mexican law, the holder of an instrument has the obligation of producing it in order to exercise the right consigned on it.

42.

Under Mexican law, when a payment instrument is paid, the original payment instrument has to be actually delivered to the payor.

43.

Under Mexican law, when a payment instrument is not paid by the drawee for whatever reason, it must be returned to the last holder, so the holder may exhaust all legal remedies and actions within his or her reach, in order to recover the value of that payment instrument.

44.

Under Mexican law, the original documentation of a payment instrument is necessary in all cases to exhaust all legal remedies relating to the collection, recovery or preservation of the rights contained in that payment instrument.

**Relationship Between USPS and Mexican Exchange Houses**

45.

For many decades, a high level of trust and cooperation between financial institutions in the United States and Mexico encouraged, facilitated, and enabled Mexican financial intermediaries such as the Exchange Houses to cash money orders issued by the U.S. Postal Service. This unique

cooperative relationship with respect to the orderly and systematic processing of the international postal money orders was the result of the close demographic, economic and geographic ties between the United States and Mexico. The majority of the international postal money orders issued in the United States were directed to Mexico by members of the Mexican American community sending money to relatives living in Mexico.

46.

As part of their regular business operations, the Exchange Houses routinely purchased, in Mexico, postal money orders issued by the USPS in the United States and endorsed by payees residing in Mexico (becoming an endorsee).

47.

The Exchange Houses have contractual arrangements and appropriate accounts with various correspondent banks located within the United States to forward the postal money orders through the Federal Reserve Banking System. The USPS postal money orders were then submitted by the Exchange Houses' U.S. correspondent banks to the Federal Reserve Bank for payment.

**<u>Proliferation of Fraudulent Claims on USPS Money Orders</u>**

48.

Mexico's 1995 "tequila crisis", a large-scale economic crisis triggered by the sharp devaluation of the peso and the ensuing rapid decline in foreign investment in Mexico, helped precipitate widescale fraud with respect to stolen or forged money orders.

49.

This fraud generated a flood of purchaser affidavits to the USPS based upon the beneficiaries' claims of never having received a money order, or of having their money orders forged.

50.

Certain purchasers of these money orders quickly became aware, or already were aware, that the USPS is not nearly as vigilant as its protocol requires in the screening of purchaser affidavits that are based upon claims of forgery and/or theft.

51.

Copies of an incredibly large number of money orders and purchaser affidavits that were returned to the Exchange Houses in Mexico contained obvious, flagrant irregularities, and/or were otherwise incomplete, and/or contained incriminating information that was totally overlooked, missed, or ignored in the USPS's negligent reviews of those 306 claims.

52.

From 1996, unknown to one another, the various individual Exchange Houses began receiving frequent notifications from their respective U.S. correspondent banks that their accounts had been debited in various amounts as a result of reclamations by the USPS with respect to postal money orders which had previously been paid. The Exchange Houses gradually became aware, on a

collective basis, that this was a large scale, widespread and systemic problem created by the USPS's complete lack of due diligence in its investigation of purchaser affidavits and the entire review process.

53.

Although the USPS knew that the Exchange Houses regularly acquired USPS postal money orders (which served to facilitate that particular aspect of the USPS's business), the USPS never warned the Exchange Houses of the increased magnitude of refund claims the USPS was experiencing or the pervasive nature of the problem.

54.

Although unknown to any of the Exchange Houses at the time, the USPS had been inundated during this period of time with a huge number of refund claims affecting possibly more than one hundred thousand previously paid money orders. These refund claims were apparently premised on allegations that the endorsements on these numerous money orders were forged.

55.

On information and belief, this profusion of refund claims related not only to money orders which had been deposited by the Exchange Houses, but to an enormous number of money orders purchased by others in various parts of the world, including domestic money orders which were cashed in the United States.

56.

None of the Exchange Houses were ever placed on notice by the USPS of the development of this problem of monumental proportions, **despite the USPS's knowledge of this problem**.

Moreover, on information and belief, the postal administration of Mexico was not advised that the USPS was being deluged with money order refund claims.

57.

None of the subject money orders were ever reported as "stolen" prior to being issued or even when forwarded through the Federal Reserve Banking System through the commercial banks with which the various Exchange Houses have correspondent relationships.

58.

As a result of the reclamations initiated by the USPS beginning and during the time period of 1996 and 1997 against Exchange House bank accounts (hereinafter sometimes referred to as the "Exchange House Money Order Reclamations"), the USPS ordered their correspondent banks to debit the Casas de Cambio's respective bank accounts, thereby directly causing monetary losses in varying amounts to the various Exchange Houses.

59.

The Exchange Houses learned from their correspondent banks that the USPS had been debiting their accounts for postal money order reclamations, oftentimes after or towards the very end of the statutory limitations period.

60.

Between the third quarter of 1996 and November 1997, at which time the Exchange Houses all began refusing to purchase USPS postal money orders, the Exchange Houses' losses from the Exchange House Money Order Reclamations aggregated in excess of $8,900,000, based upon the face amounts of the money orders.

61.

The Postmaster General had more than a reasonable time to perform and complete examinations of any and all money orders previously forwarded by the Exchange Houses, and never refused payment of any of the money orders, which is conclusive proof that those money orders were deemed as having been paid.

62.

The respective losses of each Exchange House resulting from the Exchange House Money Order Reclamations are in the following amounts:

| | |
|---|---|
| ARBITRAJE CASA DE CAMBIO, S.A. DE CV.; | $295,084.00 |
| ASESORIA CAMBIARIA, CASA DE CAMBIO, S.A. DE C.V.; | $898,767.45 |
| C.B.I. CASA DE CAMBIO, S.A. DE CV.; | $2,148,024.99 |
| CASA DE CAMBIO DINEX, S.A. DE C.V.; | $917,201.00 |
| INTERCAM CASA DE CAMBIO, SA. DE CV.; | $938,832.00 |
| CASA DE CAMBIO MONEX, S.A. DE C.V.; | $2,050,000.00 |
| CASA DE CAMBIO PUEBLA, S.A. DE C.V.; | $752,030.75 |
| S.C. DIVISAS CASA DE CAMBIO, S.A. DE C.V.; | $240,532.00 |
| CASA DE CAMBIO TAMIBE, S.A. DE CV.; and | $345,949.00 |
| CASA DE CAMBIO TIBER, S.A. DE C.V.; | $345,918.50 |
| TOTAL | $8,932,339.69 |

**Initial Attempts By Exchange Houses**
**To Address Refund Claims and Reclamations**

63.

When the U.S. correspondent banks and Mexican Exchange Houses first became aware of the abnormally high volume of money order returns in 1996-1997, the Exchange Houses promptly contacted their respective correspondent banking institutions in order to determine the cause of the alarming rate of returns.

64.

As further investigations took place, it became clear to financial intermediaries in both Mexico and the United States that this fraud was a widespread problem and, in response, the Exchange Houses immediately engaged in a concerted action coordinated by the Asociacion Mexicana de Exchange Houses ("Asociacion") with the United States Postal Service in certain negotiations, addressing, among other matters, the refund of the reclamations improperly made, the implementation of due diligence standards in the reclamation process, and how it could and should improve its procedure for screening fraudulent claims.

**Subsequent Meetings Between USPS and**
**Exchange Houses to Address Reclamations and Refunds**

65.

Finally, on November 25, 1997, representatives of the USPS first met with representatives from the Mexican Exchange Houses in Mexico City to discuss the problems with the reclamations and the high volume of money order returns. (See Attachment 1, Spreadsheet outlining meetings between USPS and Casas' representatives).

66.

The attendees at the November 25, 1997 meeting included representatives from the Exchange Houses and USPS/USPIS/OIG representatives Antonio Cifuentes, James Parrot and Ruben Trevino, all of whom were, at all times relevant to this Complaint, based in Washington, D.C. (See Attachment 1).

67.

The specific matters addressed at the November 25, 1997 meeting included: (1) the USPS/USPIS/OIG's general lack of thoroughness in its general practice of reviewing, accepting and processing any stop payment requests made by the alleged purchasers of the money orders regardless of the apparent validity or invalidity of such requests; (2) the complete failure of the USPS/USPIS/OIG and/or its agents to return the original money order documents to the Exchange Houses which completely prevented the Exchange Houses from being able to diligently investigate those matters, and which made impossible any proper administrative claims or the initiation of legal action in Mexico against any Mexican parties who had deposited the alleged forged or stolen money orders; and (3) the USPS/USPIS/OIG's lack of a clearly expressed and publicized procedure for

submitting requests for clarification or further investigation of the reclamations, if the postal procedures were called into question.

68.

The USPS/USPIS/OIG's representatives present at the November 25, 1997 meeting concurred with the necessity of clarifying or further investigating all reclamations to determine under what circumstances refunds would be proper or should otherwise be refused.

69.

Representatives from the Mexican Exchange Houses and the USPS/USPIS/OIG met again on December 10, 1997, in Washington, D.C. At that meeting, the representatives of the various Exchange Houses presented a list of 48 anomalies (hereinafter "list of anomalies") found in the reclamations. At that meeting, the USPS/USPIS/OIG agreed to the following:

a. To provide a grace period, where the USPS/USPIS/OIG would not automatically debit the Exchange Houses' correspondent banks or collect on international postal money orders until March 31, 1998, in order to give the parties adequate time to agree upon and establish a process for addressing money order claims;

b. To conduct a review to determine the reduction of the claim period;

c. To work with representatives from the Exchange Houses to review the return claims in order to determine their validity for reimbursement;

d. To return original items to Mexican financial institutions, so that said institutions can collect on these items through the proper legal channels;

e. To establish a written "watch" procedure, that would allow the Asociacion to review the refund claims and purportedly forged endorsements on the money orders prior to refunding the claimant.

f. To consider reducing expiration dates for U.S. Postal Money Orders.

g. To establish a work team that includes Jayne Schwarz, Ruben Trevino, and James Parrott (all of whom were operating out of, and reporting to, their supervisors in Washington, D.C. during all times relevant to this Complaint) to consider the following:

1.) The feasibility of implementing a guarantee system to ensure that a payer knows that an item will not be returned in two years for a fraudulent endorsement;

2.) Requiring certain forms of identification to be used when cashing money orders which would be sent to the United States to facilitate the processing of claims;

3.) Requirements that both the U.S.-based claimant and the Mexico-based payee of a non-received, or improperly negotiated U.S. International Postal Money Order, be required to submit notarized signatures.

70.

The attendees at the December 10, 1997 meeting included various representatives from the Exchange Houses and USPS/USPIS/OIG representatives Jane Dyer, Naomi Howison, Lawrence Maxwell, Florie Kelley, and Jayne Schwarz, all of whom were at all times relevant to this Complaint based in Washington, D.C., operating out of Washington, D.C., and answering to their respective supervisors in Washington, D.C. (See Attachment 1).

71.

Representatives from the Mexican Exchange Houses met with USPS officials again, in St. Louis, Mo. on January 21, 1998, to review the "list of anomalies" presented by the Exchange Houses to the USPS. (See Attachment 1). At that meeting, the USPS/USPIS/OIG representatives confirmed which points in the list of anomalies would provide a basis for reimbursing the Exchange Houses for the reclamations, and presented a flow chart outlining a new proposed 306 protocol created by the USPS's Accounting Service Center. The USPS agreed that seventeen (17) of the irregularities on that list would serve as a basis for either canceling invoices directed to the Exchange Houses or actually reimbursing the money orders that had been previously paid. In addition, the following proposals were made:

a. That the purchaser of a money order requesting a 6401 form present photo identification and customer receipt;

b. That the purchaser not be paid a refund and the bank not be billed until the payee's signature has been verified by the Asociacion;

c. That the Asociacion have seven days to respond to a 306 form;

d. That the purchaser of the money order take responsibility for verifying the authenticity of both his and the payee's signature by providing documentation such as an American passport, driver's license or other acceptable identification for himself and the equivalent Mexican identification documents for the payee;

e. That the 306 form be modified to include a statement that the purchaser is responsible for authenticating both his and the payee's signatures;

f. That the Asociacion will return claims for refunds if the items deemed critical on the 306 form have not been filled out;

g. That the 306 form be modified to include language in the payee portion that the Asociacion will have the authority to screen and review such forms if they are sent to a foreign country;

h. That the proposed statement which would result in an automatic denial of a 306 form if both sides are not filled out would be discussed with the USPS's law department;

i. That the proposed imposition of a time limit for a purchaser of a money order to return the claim would be discussed with the USPS's legal department.

72.

The attendees at the January 21, 1998 meeting included Ramon Cuffie, who, at all times relevant to this Complaint, was based at the USPS operations in suburban Washington, D.C., and

who answered on all matters to the main office of the USPS in Washington, D.C., Connie White, Sandra Beverley and Patsy Liszewski. (See Attachment 1).

73.

The last meeting between representatives from the USPS/USPIS/OIG and the Mexican Exchange Houses was again held in Mexico City on February 3-4, 1998. (See Attachment 1). The items discussed at that meeting included the results of the single January 21, 1998 meeting in St. Louis, reimbursement procedures, "watch and accept" procedures, and the drafting of a "Frame Agreement," for crediting accounts or payment for past claims.

74.

The attendees at the February 3-4, 1998 meeting included representatives from the Exchange Houses and USPS/USPIS/OIG representatives James Parrott and Jayne Schwarz, both of whom at all times relevant to this Complaint were based in Washington, D.C., operated out of Washington, D.C., and answered to their respective supervisors in Washington, D.C. (See Attachment 1).

**Agreements Reached During Meetings Between USPS and the Exchange Houses**

75.

The discussions which took place at the December 10, 1997 meeting in Washington, D.C. culminated in a letter dated December 23, 1997 from USPS representative Jayne Schwarz, who was based in Washington, D.C. In her letter, Jayne Schwarz emphasized the importance of maintaining dialogue between the USPS and the Exchange Houses, agreed to examine the points of agreement discussed at the December 10, 1997 meeting, insisted upon the "acceptance of International USPS

Money Orders for negotiation by Exchange Houses in Mexico," and, importantly, recommended that the Exchange Houses start again accepting Postal Money Orders with the assurance that the USPS was making sincere, conscientious efforts to improve the process for reviewing claims on money orders.

76.

The discussions which took place at the December 10, 1997 meeting were memorialized in a January 14, 1998 letter from Washington, DC by USPS representatives Jayne Schwarz and James M. Parrott. Their letter expressed an intent to "enable cashing of US Postal International Money Orders in Mexico" and confirmed the agreement reached at that meeting that the USPS would (1) stop debiting the accounts of the Exchange House's correspondent banks during an agreed-to "truce" period; (2) reduce the claim period; (3) reimburse claims previously made; (4) return all of the original money order documents to the Mexican financial institutions; and (5) establish a "watch" procedure to prevent future fraudulent conduct in the processing of money orders.

77.

At the December 10, 1997 meeting, Jayne Schwarz emphatically represented that the USPS maintained a 300 million dollar ($300,000,000.00) fund from uncollected money orders which could be utilized to reimburse the Exchange Houses for all of the improper or undue reclamations previously agreed upon.

78.

At the January 21, 1998 meeting, the USPS representatives confirmed that certain points from the list of anomalies would provide a basis for reimbursing the Exchange Houses for the

reclamations, and presented a flow chart outlining a new proposed 306 protocol created by the USPS's Accounting Service Center.

79.

At the February 3-4, 1998 meeting in Mexico City, the participants entered into and ratified several previous agreements, including one stipulating that reimbursements for the reclamations already made would proceed in various phases, with Phase 1 allowing claims based upon points 1, 2, 4, 11, 12, 13, 14, 17, 20, 22, 29, 30, 35, 40, 45, and 48 from the "list of anomalies." These agreements resulted in the Casas agreeing to resume the purchase of U.S. postal money orders.

80.

The important agreements reached during this series of meetings between representatives from the USPS, most of which were from the USPS offices in Washington, D.C., and the Exchange Houses, taken together with the correspondence and memoranda contemporaneously exchanged between representatives of both parties, constitute the terms of the agreement between the Exchange Houses and the USPS regarding the USPS's reimbursement of the reclamation charges incurred by the various Exchange Houses.

81.

As a result, the Exchange Houses agreed to continue accepting and processing USPS money orders in reliance upon the USPS's acknowledgment, promise and representations that the list of anomalies presented by the Exchange Houses' representatives contained valid bases for reimbursement of claims, and the USPS's expressed agreement to timely reimburse the Exchange Houses for reclamations already made based on the Exchange Houses' "list of anomalies" and the

USPS's agreement to return all original money order documents to the Exchange Houses for postal money orders where reclamations were not to be reimbursed.

82.

In a letter dated November 7, 1998, from Linda Kudelka, head of the General Accounting Section of the USPS in Washington, D.C. expressly stated, "*The US Postal Service has an agreement with the Mexican Casas*..." (emphasis added), confirming that the USPS purposely entered into a binding agreement with the Exchange Houses to investigate the validity of past reclamations, to reimburse the Exchange Houses for those reclamations found to be invalid, and to return all original money order documents to the Exchange Houses for the reclamations found to be valid. With respect to future reclamations, the agreement provided for the immediate implementation of a new 306 process and pilot program aimed at repairing the gaps in the USPS's existing 306 process.

**USPS's Complete Failure to Perform Under Its Agreement with the Exchange Houses**

83.

Despite all of its promises and representations regarding its desire to continue its business relationship with the Exchange Houses, the USPS never once performed under the various agreements and representations it made at its meetings and in its communications with the Exchange Houses.

84.

After further negotiations concerning the list of irregularities failed, the Mexican Exchange Houses and their correspondent U.S. banks launched a protest letter campaign in the hopes that it would prompt the USPS to implement the promised new procedures and adhere to existing due diligence guidelines for dealing with suspicious affidavits, and to approach the appropriate U.S. banks to resolve the issue regarding the reclamations. The USPS never responded to the protest letters.

85.

The USPS completely failed to respond to the protest letters or to otherwise inform the financial institutions of the proper procedure for making requests for clarification or investigations to the USPS. These actions were intended to, and did, delay other efforts by the Exchange Houses to bring claims against the USPS, since they properly expected the USPS to honor its agreements and to engage in meaningful dialogue to address this problem.

86.

The Exchange Houses have properly presented their claims to the USPS, which has completely failed to abide by its agreements and refused to reimburse the Exchange Houses for any part of the Exchange House Money Order Reclamations.

87.

In a letter dated September 24, 1999, USPS representative Jayne Schwarz notified the representatives of the Mexican Exchange Houses from Washington, D.C., that the USPS was

terminating the "Pilot Program", which had been intended to address the agreed-to deficiencies in the USPS's previous and continued handling of reimbursement claims on postal money orders.

88.

The USPS ignored the letters and email messages regarding the numerous errors in the documents sent by representatives of the Mexican Exchange Houses for review under the Pilot Program, which attempted to address the money order fraud which resulted in the reclamations. Nearly all of these communications were directed to USPS personnel based at the USPS's operations in Washington, D.C. and the USPS's satellite operations northern Virginia, which are fully integrated with the USPS's main center of operations in Washington, D.C. These communications included:

1. 9/23/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
2. 9/14/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
3. 9/8/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
4. 9/6/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
5. 8/27/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
6. 8/9/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
7. 7/27/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
8. 7/23/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
9. 7/20/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
10. 7/14/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
11. 7/2/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
12. 6/10/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**

13. 6/9/99 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
14. 6/4/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
15. 6/2/99 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
16. 6/2/99 Ramirez Rodriguez letter to Ramon Cuffie **(USPS-VA)**
17. 5/13/99 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
18. 5/11/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)**
19. 5/11/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)**
20. 5/12/99 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
21. 5/3/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
22. 4/19/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
23. 4/19/99 Ramirez Rodriguez letter to Ramon Cuffie **(USPS-VA)**
24. 4/19/99 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
25. 4/16/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
26. 4/13/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
27. 3/31/99 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
28. 3/29/99 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
29. 3/25/99 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
30. 3/8/99 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
31. 3/2/99 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
32. 3/1/99 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
33. 3/26/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
34. 2/24/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
35. 2/8/99 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
36. 2/1/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
37. 1/26/99 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
38. 1/25/99 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
39. 1/21/99 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
40. 1/19/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
41. 1/19/99 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
42. 1/15/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
43. 1/14/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**

44. 1/12/99 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
45. 1/7/99 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
46. 1/5/99 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
47. 12/30/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
48. 12/28/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
49. 12/22/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
50. 12/16/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
51. 12/11/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
52. 12/7/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
53. 12/4/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
54. 12/2/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
55. 11/27/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
56. 11/27/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
57. 11/25/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
58. 11/19/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
59. 11/11/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
60. 11/9/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
61. 11/6/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
62. 11/4/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
63. 10/30/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
64. 10/29/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
65. 10/26/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA**
66. 10/20/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
67. 10/19/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
68. 10/15/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
69. 10/13/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
70. 10/13/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**71. 10/9/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**

72. 10/8/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
73. 10/7/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
74. 10/5/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
75. 10/2/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
76. 9/29/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
77. 9/28/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
78. 9/25/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
79. 9/24/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
80. 9/22/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
81. 9/18/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
82. 9/18/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
83. 9/17/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
84. 9/15/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
85. 9/14/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
86. 9/14/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
87. 9/12/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**, Sandra Beverley (D.C.????), Edward Brown (MO)
88. 9/11/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
89. 9/9/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
90. 9/8/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
91. 9/7/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
92. 9/2/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
93. Forwarded 8/31/98 Jaime Schabes (Mexico) Email to Jose Antonio Ramirez re teleconference and to Jayne Schwarz **(D.C.)**
94. 8/28/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
95. 8/27/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
96. 8/25/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
97. 8/24/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
98. 8/21/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**

99. Forwarded 8/21/98 Jaime Schabes (Mexico) Email to Jose Antonio Ramirez re teleconference
100. 8/20/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
101. 8/19/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
102. 8/18/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
103. 8/17/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
104. 8/14/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
105. 8/13/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
106. 8/12/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
107. Forwarded 8/11/98 Jaime Schabes (Mexico) Email to Jose Antonio Ramirez re teleconference
108. 8/10/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
109. 8/7/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
110. 8/7/98 Jaime Schabes (Mexico) Email to Jose Antonio Ramirez **(SPANISH)**
111. 8/7/98 Jorge Maass emails to Jaime Schabes (Mexico) (Reference to Jayne Schwarz **(D.C.)** in title)
112. 8/6/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
113. 8/4/98 Jorge Maass email to Jayne Schwarz **(D.C.)** With cc to Ramon Cuffie **(USPS-VA)**
114. 8/4/98 Jaime Schabes (Mexico) Email to Jose Antonio Ramirez **(SPANISH)** (looks like Ramirez forwarded a letter he had written to Jayne Schwarz **(D.C.)**
115. 8/4/98 Jorge Maass email to Jaime Schabes (Mexico) Re: Ramirez letter to Jayne Schwarz **(D.C.)**
116. 8/4/98 Jayne Schwarz (D.C.) email
117. 8/3/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
118. 8/4/98 Jorge Maass email to Jaime Schabes (Mexico)
119. 7/31/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
120. 7/31/98 Jaime Schabes (Mexico) Email to Jayne Schwarz **(D.C.)**
121. 7/31/98 Jorge Maass email to Jaime Schabes (Mexico)
122. 7/31/98 Jaime Schabes (Mexico) Email to Jose Antonio Ramirez
123. 7/31/98 Jayne Schwarz **(D.C.)** email to Ramon Cuffie **(USPS-VA)**
124. 7/31/98 Jorge Maass email to Jaime Schabes (Mexico)
125. 7/30/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**

126. 7/30/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
127. 7/30/98 Jorge Maass emails to Ramon Cuffie **(USPS-VA)** With cc to Jayne Schwarz **(D.C.)**
128. 7/28/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)** And to Jayne Schwarz **(D.C.)**
129. 7/27/98 Jorge Maass emails to Ramon Cuffie **(USPS-VA)** And to Jayne Schwarz **(D.C.)**
130. 7/27/98 Jorge Maass email to Jayne Schwarz **(D.C.)**
131. 7/27/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)**
132. 7/27/98 Jaime Schabes (Mexico) Email to Jose Antonio Ramirez
133. 7/21/98 Jaime Schabes (Mexico) Email to Jose Antonio Ramirez **(SPANISH)**
134. 7/20/98 Jaime Schabes (Mexico) Email to Jayne Schwarz **(D.C.)**
135. 7/20/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)**
136. 7/20/98 Jorge Maass email to Jayne Schwarz **(D.C.)**
137. 7/21/98 Jaime Schabes (Mexico) Email to Jose Antonio Ramirez **(SPANISH)**
138. 7/20/98 Jaime Schabes (Mexico) Email to Jayne Schwarz **(D.C.)**
139. 7/17/98 Ramirez Rodriguez correspondence to Ramon Cuffie **(USPS-VA)**
140. 7/17/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)**
141. 7/16/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)**
142. 7/15/98 Jorge Maass email to Ramon Cuffie **(USPS-VA)**

89.

The Casa de Cambio Puebla, S.A., in addition to their continued individual and collective attempts to address the pervasive money order frauds which resulted in reclamations through many meetings and other communications with representatives of the USPS, sent a specific claim to the USPS in March 1998, after one of its pouches containing 263 postal money orders worth $97,405.00 was stolen from a Federal Express carrier while en route to Bank One Chicago, its correspondent bank in the United States.

90.

Incredibly, the USPS never responded to the Casa de Cambio, Puebla's claim, despite the Exchange Houses' diligent efforts to comply with the USPS's protocol for filing claims and to ensure that its claim was delivered to the USPS, despite the Exchange Houses' diligent efforts to file charges with the District Attorney's office in Mexico City, regarding the theft, initiate contact with the USPS through telephone calls, comply with the USPS's protocol for filing claims and ensure that its claim was delivered to the USPS.

**Damages Incurred by the Exchange Houses**

91.

Plaintiffs hereby incorporate each and every allegation contained in paragraphs 1-90 of the Complaint as if fully set forth herein.

92.

The USPS did not perform its obligations to pay the postal money orders under applicable commercial law, under the terms of the various express agreements and representations it made with the Exchange Houses, and failed to respond to properly submitted postal money order reimbursement claims, in cases such as that of the Casa de Cambio, Puebla. Consequently, the Exchange Houses suffered increasing losses in the form of compensation not paid or subsequently debited due to the reclamations, loss of their ability to initiate legal action in Mexico against the depositors of fraudulent money orders, and as a result of their diminished standing in the money order market.

**COUNT I**

**BREACH OF CONTRACT WITH RESPECT TO USPS' FAILURE TO PERFORM UNDER ITS AGREEMENTS WITH AND REPRESENTATIONS TO THE MEXICAN EXCHANGE HOUSES**

93.

Plaintiffs hereby incorporate each and every allegation contained in paragraphs 1-92 of the Complaint as if fully set forth herein.

94.

The important agreements reached during the meetings between representatives from the USPS and the Exchange Houses, taken together with the correspondence and memoranda exchanged between representatives of both parties, constitute the terms of the agreement between the Exchange Houses and the USPS, regarding the USPS's reimbursement of the reclamation charges incurred by the various Exchange Houses.

95.

USPS breached its contractual obligations to Plaintiffs by failing to perform under this agreement, as expressed in part in its letter dated January 14, 1998, memorializing the discussions which took place between the USPS and the Exchange Houses on December 10, 1997. At this meeting USPS representatives Jayne Schwarz and James M. Parrott expressed an intent to "enable cashing of US Postal International Money Orders in Mexico" and confirmed the agreement reached at the December 10, 1997 meeting, that the USPS would (1) Stop debiting the accounts of the Exchange Houses' correspondent banks during the "truce" period; (2) reduce the claim period; (3) reimburse the claims previously made; (4) return the original money order documents to the Mexican

financial institutions; and (5) establish a "watch" procedure to prevent future fraudulent conduct in the processing of money orders.

96.

USPS breached its contractual obligations to Plaintiffs by failing to abide by the agreement it made at the December 10, 1997 meeting, where Jayne Schwarz represented that the USPS had a 300 million dollar fund from uncollected money orders which could be used to reimburse the Exchange Houses for improper or undue reclamations.

97.

USPS breached its contractual obligations to Plaintiffs by failing to perform under the agreements made at the January 21, 1998 meeting, where the USPS representatives confirmed which points in the list of anomalies would provide a basis for reimbursing the Exchange Houses for the reclamations, and presented a flow chart outlining a new proposed 306 protocol by the USPS's Accounting Service Center.

98.

USPS breached its contractual obligations to Plaintiffs by failing to perform under the agreements made at the February 3-4, 1998 meeting, where participants entered into and ratified several previous agreements, including one stipulating that the reimbursements for the reclamations already made would proceed in various phases, with Phase 1 allowing claims based upon points 1, 2, 4, 11, 12, 13, 14, 17, 20, 22, 29, 30, 35, 40, 45, and 48 in the "list of anomalies."

99.

USPS breached its contractual obligations to Plaintiffs by failing and refusing to reimburse the Exchange Houses for any part of the Exchange House Money Order Reclamations.

100.

USPS breached its contractual obligations to Plaintiffs when it terminated the "Pilot Program", which was intended to address the deficiencies in the USPS's handling of reimbursement claims on postal money orders.

101.

The USPS breached its contractual obligations to Plaintiffs when it ignored the letters and e-mail messages regarding the numerous errors in the documents sent by representatives of the Mexican Exchange Houses for review under the pilot program.

102.

The USPS breached its contractual obligations to Plaintiffs by failing to respond to the Casa de Cambio, Puebla's claim for $ 97,405.00, despite the Exchange Houses' diligent efforts to comply with the USPS's protocol for filing claims and ensure that its claim was delivered to the USPS, despite the that particular Exchange House's diligent efforts to file charges with the District Attorney's office in Mexico City, regarding the theft, initiate contact with the USPS through telephone calls, comply with the USPS's protocol for filing claims and ensure that its claim was delivered to the USPS.

103.

The USPS's failure to perform under the terms of the various agreements and representations it made with the Exchange Houses and its failure to respond to properly submitted postal money

order reimbursement claims, in cases such as that of the Casa de Cambio, Puebla, caused the Exchange Houses to suffer increasing losses in the form of the compensation they never received for the reclamations, the loss of their ability to initiate legal action in Mexico against the depositors of the fraudulent money orders, and as a result of their diminished standing in the money order market.

## PREJUDGMENT INTEREST

104.

Plaintiffs hereby incorporate each and every allegation contained in paragraphs 1-103 of the Complaint as if fully set forth herein.

105.

The Defendants are obligated to pay pre-judgment interest because the USPS, USPIS and OIG have the status of a private commercial enterprise, and are obligated to pay prejudgment interest to the same extent as would a private party. In order that the Exchange Houses be made whole, and so that the USPS not be unjustly enriched, the Court should award prejudgment interest at an appropriate rate in favor of each of the Exchange Houses from the respective dates upon which each of the Exchange House Money Order Reclamations occurred. Such prejudgment interest should be at a rate at least equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of each respective Exchange House Money Order Reclamation, as set forth in 28 U.S.C. §1961.

## DEMAND FOR JURY TRIAL

106.

Plaintiffs hereby restate and incorporate herein by reference the allegations set forth above in paragraphs 1-105.

107.

The Plaintiffs, hereby demand a trial by jury on each of the Counts set forth herein.

**WHEREFORE,** Plaintiffs demand judgment against all named Defendants herein, jointly and severally as follows:

a. For actual and compensatory damages in excess of this Court's minimal jurisdictional amount in an amount to be determined at trial;

b. For prejudgment interest and post-judgment interest;

c. For cost of the Court and attorney's fees;

d. For a TRIAL BY JURY, and

e. For such further relief which this Court deems just and proper in the premises.

Respectfully submitted this 18th day of July, 2005.

__s/ Howard G. Slavit________
Howard G. Slavit, Esq.
Saul Ewing LLP
1025 Thomas Jefferson St., N.W.
Suite 425 West
Washington, D.C. 20007
(202) 295-6600
(202) 295-6700 Fax

__s/ Richard H. Middleton, Jr.__
Richard H. Middleton, Jr., Esq.
The Middleton Firm, L.L.C
58 East Broad Street
Savannah, GA 31401
(912) 234-1133 Tel.
(912) 233-1750 Fax
Attorneys for Plaintiffs