IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-217C
(Senior Judge Smith)

ARBITRAJE CASA DE CAMBIO, S.A. DE CV., et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION TO DISMISS

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director

DORIS S. FINNERMAN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202)307-0300
Facsimile: (202)305-7643
Attorneys for Defendant

OF COUNSEL:
GARY SHAPIRO
Senior Litigation Counsel
United States Postal Service

April 10, 2006

## TABLE OF CONTENTS


PAGE(S)

STATEMENT OF THE ISSUES .......... 1

STATEMENT OF FACTS .......... 2

A. Regulatory Overview Of Postal Money Orders, The Right Of Reclamation, And Purchasers' Claims For Refunds .......... 2

B. Plaintiffs' Original Complaint And The District Court's Disposition .......... 4

C. The "Tequila Crisis" .......... 5

D. The Series Of Meetings And Correspondence That Allegedly Comprise The "Contract" .......... 7

E. Plaintiffs' Claim Of Breach .......... 11

ARGUMENT .......... 12

I. Standards Of Review .......... 12

II. The Court Does Not Possess Jurisdiction Over Plaintiff's Alleged Contract Claim Because Plaintiffs Have Not Satisfied The Jurisdictional Prerequisites Of The Contract Disputes Act .......... 13

III. In The Alternative, The Alleged Contract Is Not Within The Court's Jurisdiction Because The Government Was Acting In Its Sovereign Capacity .......... 14

IV. Plaintiffs' Claims Do Not Meet The Jurisdictional Requirements For Contracts Made In The Government's Sovereign Capacity .......... 17

V. In The Alternative, Plaintiffs Have Not Alleged Facts Sufficient To Show That A Contract Existed .......... 18

CONCLUSION .......... 24

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

Aetna Casualty & Surety Co. v. United States,
228 Ct. Cl. 146, 655 F.2d 1047 (1981) ........ 12

Arbitraje Casa de Cambio v. United States Postal Service,
297 F. Supp. 2d 165 (D.D.C. 2003) ........ 4, 5

Arbitraje Casa de Cambio v. United States Postal Service,
2004 WL 3257073 (D.D.C. 2004) ........ 5, 13

Baltimore & Ohio R.R. Co. v. United States,
261 U.S. 592 (1923) ........ 18, 21

Bel Pre Health Care Ctr. v. United States,
24 Cl. Ct. 495, 496 (1991) , aff'd, 980 F.2d 745 (Fed. Cir. 1992) ........ 22, 23

Blackstone Realty LLC v. F.D.I.C.,
244 F.3d 193 (1st Cir. 2001) ........ 1

Bolognesi v. United States,
189 F. 335 (2d Cir. 1911) ........ 15

Bowen v. Pub. Agencies Opposed to Social Security Entrapment,
477 U.S. 41 (1986) ........ 17

Casa de Cambio Comdiv S.A. de C.V. v. United States,
291 F.3d 1356 (Fed. Cir. 2002) ........ 4

Commonwealth of Kentucky v. United States,
27 Fed. Cl. 173 (1992) ........ 24

Coyle's Pest Control, Inc. v. Cuomo,
154 F.3d 1302 (Fed. Cir. 1998) ........ 23

Currency Services v. Matthews,
90 F. Supp. 40 (W.D. Wis. 1950) ........ 16

Equal Employment Opportunity Commission v. St. Francis Parochial School,
117 F.3d 621 (D.C. Cir. 1997) ........ 1

Federal Crop Insurance Corporation v. Merrill,
332 U.S. 380 (1947) ........ 19

Franklin Sav. Corp. v. United States,
56 Fed. Cl. 720 (2003), aff'd, 97 Fed. Appx. 331 (2004) .......... 20

Garza v. United States,
34 Fed. Cl. 1 (1995) .......... 22

Goldstick v. ICM Realty,
788 F.2d 456 (7th Cir.1986) .......... 22

Gould, Inc. v. United States,
935 F.2d 1271 (Fed. Cir. 1991) .......... 13

Hamilton Securities Advisory Services, Inc. v. United States,
60 Fed. Cl. 144 (2004) .......... 22

James M. Ellett Const. Co., Inc. v. United States,
93 F.3d 1537 (Fed. Cir. 1996) .......... 13

Kania v. United States,
227 Ct. Cl. 458, 650 F.2d 264 (1981) .......... 14, 17

Kinne v. United States,
21 Cl. Ct. 104 (1990) .......... 13

Klamath Irrigation Dist. v. United States,
67 Fed. Cl. 504 (2005) .......... 17

Krigel v. United States,
229 Ct. Cl. 73, 662 F.2d 741 (1981) .......... 20

Lewin v. United States,
145 Ct. Cl. 249, 170 F. Supp. 646 (1959) .......... 15

Modern Sys. Tech. Corp. v. United States,
979 F.2d 200 (Fed. Cir. 1992) .......... 22

Peoples Bank & Trust Co. V. United States,
11 Ct. Cl. 554 (1987) .......... 18

Rochman v. United States,
27 Fed. Cl. 162 (1992) .......... 13

SCM Corp. v. United States,
219 Ct. Cl. 459, 595 F.2d 595 (1979) .......... 21

Sanders v. United States,
252 F.3d 1329 (Fed. Cir. 2001) .......... 17, 18

Saul Bass and Associates v. United States,
205 Ct. Cl. 214, 505 F.2d 1386 (1974) .......... 21

Scheuer v. Rhodes,
416 U.S. 232 (1974) .......... 12, 13

Stewart v. United States,
300 F. Supp. 1047 (E.D. Mich 1969) .......... 16

Tewani Imports, Inc. v. Norwest Bank, N.A.,
139 F. Supp. 2d 805 (S. D. Tex. 2001) .......... 4

Total Med. Mgmt., Inc. v. United States,
104 F.3d 1314 (Fed. Cir. 1997) .......... 18

Trauma Service Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) .......... 19

Truckee-Carson Irr. Dist. v. United States,
14 Cl. Ct. 361 (1988) .......... 21

United States v. Northwestern Nat. Bank & Trust Co.,
35 F. Supp. 484 (D. Minn. 1940) .......... 15, 16

United States v. Testan,
424 U.S. 392 (1976) .......... 12

Willard, Sutherland & Co. v. United States,
262 U.S. 489 (1923) .......... 23

**STATUTES and REGULATIONS**

28 U.S.C § 1491 .......... 12

41 U.S.C. § 602(a) .......... 13

39 C.F.R. § 111.1 .......... 2

39 C.F.R. § 20.1 .......... 2

**MISCELLANEOUS**

Restatement (Second) of Contracts § 20 (1979) .......... 19

Restatement (Second) of Contracts § 33(2) (1979) .......... 22

Ronald A. Anderson, Anderson on the Commercial Code, § 3-104:61 (3d ed. 1991-94) .......... 16

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ARBITRAJE CASA DE CAMBIO, S.A. DE CV., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 05-217C |
| | ) | (Senior Judge Smith) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims, defendant respectfully requests the Court to dismiss plaintiff's complaint for lack of jurisdiction or, in the alternative, for failure to state a claim upon which relief can be granted. In support of defendant's motion, we rely upon the complaint, the following brief, and the attached appendix of documents referenced in the complaint.[1]

STATEMENT OF THE ISSUES

1. Whether the Court possesses subject matter jurisdiction over plaintiffs' claim because the alleged contract is subject to the requirements of the Contract Disputes Act and plaintiffs did not submit a certified claim or obtain a contracting officer's final decision upon their claim.

2. Whether the Court possesses subject matter jurisdiction over plaintiffs' claim that the Government breached a contract to implement new procedures relating to money order claims.

3. Whether plaintiffs' complaint fails to state a claim upon which relief may be granted because plaintiffs failed to allege the elements of a valid breach of contract claim.

---

[1] The Court may considered documents relied upon in a complaint on a motion to dismiss without thereby converting the motion into one for summary judgment. See Blackstone Realty LLC v. F.D.I.C., 244 F.3d 193 (1st Cir. 2001); Equal Employment Opportunity Commission v. St. Francis Parochial School, 117 F.3d 621, 624 (D.C. Cir. 1997).

## STATEMENT OF FACTS[2]

A. Regulatory Overview Of Postal Money Orders, The Right Of Reclamation, And Purchasers' Claims For Refunds

The United States Postal Service ("USPS") issues postal money orders made payable by the purchaser to a person or specific entity. The Domestic Mail Manual ("DMM") and International Mail Manual ("IMM")[3] specify the procedures that the USPS follows in paying, refunding, and reclaiming money orders. The endorsers of postal money orders – here, the plaintiffs/Exchange Houses – are deemed the guarantors of the authenticity of the endorsement of payees. Specifically, section S020.3.3 of the DMM states:

> The presenting bank and the endorser of a money order presented for payment are deemed to guarantee to the postmaster general that all prior endorsements are genuine, whether an express guarantee to that effect is placed on the money order. When an endorsement is made by a person other than the payee personally, the presenting bank and the endorser are deemed to guarantee to the postmaster general, in addition to other warranties, that the person who so endorsed had unqualified capacity and authority to endorse the money order in behalf of the payee.

DMM § S020.3.3. Accordingly, the USPS is not held accountable when financial depository institutions (like the Exchange Houses), who are in the best position to detect fraud by verifying the identity of an endorser, fail to properly authenticate an endorsement.

Under postal regulations, the Postmaster General

> has the usual right of a drawee to examine money orders presented for payment by banks through the Federal Reserve System and to refuse payment of money orders, and has a reasonable time after presentation to make each examination. Provisional credit is given to the federal reserve bank when it furnishes the money

---

[2] For the purposes of defendant's motion to dismiss, defendant will treat the allegations of plaintiffs' complaint as true. If defendant's motion to dismiss is denied, defendant reserves the right to contest each and every allegation of the complaint.

[3] The DMM and the IMM are incorporate by reference into the Code of Federal Regulations. See 39 C.F.R. § 111.1; 39 C.F.R. § 20.1.

> orders for payment by the postmaster general. Money orders are deemed to be paid only after examination is completed, subject to the Postmaster General's right to make reclamation . . .

DMM § S202.3.2 (emphasis added). "Reclamation" means "the action taken by the postmaster general to obtain refund of the amounts of paid money orders." DMM § S0202.3.1(d).

The Postmaster General's right of reclamation is delineated in DMM § S0202.3.4, which states:

> The postmaster general has the right to demand refund from the presenting bank of the amount of a paid money order if, after payment, the money order if found to be stolen, or to have a forged or unauthorized endorsement, or to contain any material defect or alteration not discovered on examination. Such right includes, but is not limited to, the right to make reclamation of the amount by which a genuine money order with a proper and authorized endorsement has been raised. Such right must be exercised within a reasonable time after the postmaster general discovers that the money order is stolen, bears a forged or unauthorized endorsement, or is otherwise defective. If refund is not made by the presenting bank within 60 days after demand, the postmaster general takes such actions as may be necessary to protect the interests of the United States.

DMM § S020.3.4.

A purchaser who believes that a money order has been lost or stolen may submit a claim to the USPS through a five-step process: (1) The purchaser presents the money order receipt to any post office and receives a "request for information," Form 6401. (2) The purchaser and the intended payee both sign the Form 6401 under penalty of perjury and submit it to the USPS. (3) If the money order has been cashed, the USPS notifies the customer and sends him or her a copy, from microfilm, of the front and back of the cashed money order. (4) If the customer believes that someone other than the intended payee cashed the money order, he or she notifies the USPS. (5) If the customer completes the preceding step, the USPS sends the customer a claim for alleged wrong payment, Form 306, which the purchaser and payee both sign under penalty of perjury, and submit to the USPS.

Upon receipt of the Form 306, the USPS retrieves the original money order and compares the signatures of the purchaser and intended payee on the Form 306 with the signatures on the original money order. If the signatures appear to be the same, the claim is denied. If the signatures do not match and the USPS concludes that the money order was not cashed by either the purchaser or the intended payee, the USPS sends a money order in the same amount to the original purchaser. At the same time that it sends payment to the original purchaser, the USPS seeks to reclaim that amount from the bank which presented the fraudulently endorsed money order to the Federal Reserve Bank. After the presenting bank is identified, the USPS sends a copy of the money order, the executed Form 306, and an invoice requesting payment. When the USPS reclaims the money from the presenting bank, the bank may then debit the account of the Exchange House which presented the falsely endorsed money order to it for payment. See Tewani Imports, Inc. v. Norwest Bank, N.A., 139 F. Supp. 2d 805, 808-09 (S. D. Tex. 2001).

B. Plaintiffs' Original Complaint and The District Court's Disposition

In April 2002, plaintiffs, the Exchange Houses, filed a complaint in the United States District Court for the District of Columbia, seeking to compel the USPS to pay them nearly $9 million allegedly arising from their negotiation of USPS money orders that were later found to contain forged endorsements. Defendants filed a Motion to Dismiss or, in the Alternative, to Transfer.

On December 31, 2003, the court granted defendants' Motion to Dismiss. See Arbitraje Casa de Cambio v. United States Postal Service, 297 F. Supp. 2d 165 (D.D.C. 2003). The Court held that plaintiffs "have no claim against the government in any action based on postal money orders;" that plaintiffs' only claim on the money orders was against their presenting banks. Id. at 169. See Casa de Cambio Comdiv S.A. de C.V. v. United States, 291 F.3d 1356, 1366 (Fed. Cir.

2002) ("The depositer [sic] [plaintiff], unlike the presenting bank, has no claim against the United States").

In addition to the claims actually pleaded in the Complaint, the Plaintiffs raised a claim for the first time in their opposition memorandum, the essence of which was that the Exchange Houses had engaged the USPS in a series of meetings which, according to the Exchange Houses, constitute "express contracts with the USPS, whereby the Exchange Houses would continue to accept USPS money orders and the USPS would reimburse the Exchange Houses for certain reclamations." Arbitraje, 297 F. Supp. 2d at 170. The court held that because these claims were not within the four corners of the complaint, they were not properly before the court, noting: "'It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.'" Id. (citation omitted). The court declined to consider this claim and further held that, if plaintiffs desired to pursue this claim, they had to seek leave to file an amended complaint. Id.

On January 15, 2004, plaintiffs filed such a motion, which was granted by the court on February 10, 2004. On November 30, 2004, the court found that the contract alleged by plaintiffs was subject to the Contract Disputes Act ("CDA"), and, accordingly, it did not possess subject matter jurisdiction over this claim. The case was transferred to this Court. Arbitraje Casa de Cambio v. United States Postal Service, 2004 WL 3257073 (D.D.C. 2004). As a result, the only claim before this Court is a claim that a series of meetings between the Exchange Houses and the USPS constituted an enforceable contract, which was breached.

C. The "Tequila Crisis"

The plaintiffs' complaint outlines what plaintiffs characterize as a "Proliferation of Fraudulent Claims on USPS Money Orders." See Amended Comp. at ¶¶ 48-62. Specifically, the Exchange Houses claim that beginning sometime in 1995, Mexico suffered an economic

crisis (the "tequila crisis") brought on by the devaluation of the peso and a rapid decline in foreign investment in Mexico. Amended Comp. at ¶ 48. This precipitated "widescale fraud with respect to stolen or forged money orders." Id. The Exchange Houses claim that a large number of money orders and purchaser affidavits were returned to them that contained obvious, flagrant irregularities, that were otherwise incomplete, "and/or contained incriminating information that was totally overlooked, missed, or ignored in the USPS's negligent reviews of those 306 claims." Id. at ¶ 49-51.

The Exchange Houses began to receive notifications from their respective correspondent banks in the United States that their accounts had been debited in various amounts as a result of reclamations by the USPS.[4] Id. at ¶ 52. Plaintiffs further allege that, as a result of the reclamations initiated by the USPS, the USPS "ordered their correspondent banks to debit the Casas de Cambios' respective bank accounts, thereby directly causing monetary losses in varying amounts to the various Exchange Houses." Id. at ¶ 58. The Exchange Houses claim that these losses from the money order reclamations are in excess of $8.9 million. Id. at ¶¶ 60, 62.[5]

According to the Amended Complaint, when the Exchange Houses first became aware of the high volume of money order returns, the Exchange Houses contacted their respective correspondent banks to determine the cause of the returns. Id. at ¶ 63. The Exchange Houses claim that "it became clear to financial intermediaries in both Mexico and the United States that this fraud was a widespread problem and, in response, the Exchange Houses immediately engaged in a concerted action coordinated by the Association Mexicana de Exchange Houses

[4] The plaintiffs maintain accounts at U.S. banks in which the money orders are deposited and then forwarded through the Federal Reserve banking system. Amended Complaint at ¶ 47.

[5] Pursuant to the doctrines of res judicata and collateral estoppel, these claims of injury resulting from reclamations are not properly before this Court.

with the United States Postal Service in certain negotiations addressing, among other matters, the refund of reclamations improperly made, the implementation of due diligence standards in the reclamation process, and how it could and should improve its procedure for screening fraudulent claims." Id. at ¶ 64.

D. The Series of Meetings And Correspondence That Allegedly Comprise The "Contract"

The Amended Complaint describes four meetings between the Exchange Houses and the USPS that allegedly form the contract upon which the Amended Complaint is predicated. See generally Amended. Comp. at ¶¶ 65-82. The first of these meetings was conducted on November 25, 1997, in Mexico City, Mexico. Id. at ¶ 65. This session involved discussions on a series of topics. See Amended Comp. at ¶ 67. The plaintiffs do not allege that this meeting resulted in any kind of agreement that they construe to be an enforceable contract. See id. at ¶ 68 (claiming that the USPS representatives present at that meeting "concurred with the necessity of clarifying or further investigating all reclamations to determine under what circumstances refunds would be proper or should otherwise be refused").

The second meeting between the Exchange Houses and USPS representatives occurred on December 10, 1997, in Washington, D.C. See id. at ¶¶ 69-70. According to plaintiffs, the representatives of the various Exchange Houses presented a list of 48 "anomalies" found in the USPS' reclamations. See id. at ¶ 69. The plaintiffs further allege that the USPS agreed to a number of actions, primarily addressing procedures for processing money order claims. See id. at ¶¶ 69a-69g.

Plaintiffs claim that the discussions that took place at the December 10, 1997, meeting in Washington , D.C. culminated in a letter dated December 23, 1997, from USPS representative Jayne Schwarz. See Comp. at ¶ 75. This letter states, in relevant part:

> I think the meeting [in Washington, D.C.] was productive and a very good start to finding solutions to the problems relating to the acceptance of international United States Postal Money Orders for negotiation by exchange houses in Mexico.
>
> I agree that we need to have a letter of intent to outline the parameters of our working group. Your letter of December 18, 1997, outlines, in principle, our discussion at the meeting in Washington and is an excellent starting point. Hopefully, we can draft the final letter after our meeting in late January 1988. By breaking up into smaller work groups, it is more likely that we will find solutions and implement a workable plan. Since we do not have the answers now, it is not possible to draft the final letter of intent. We agreed to examine each of the points discussed to determine the feasibility of implementation. The possibility of implementation will be clearer after our next meeting.

See December 23, 1997, letter from Jayne Schwarz to Manual Abreu and James Schabes ("December 23 letter") (Exhibit A) (emphasis added).

Plaintiffs claim that the discussions from the December 10 meeting were further memorialized in a January 14, 1998, letter from USPS representatives. Amended Comp. at ¶ 76. This letter states, in relevant part:

> Thank you for joining us in the Washington, DC area to outline issues needed to enable cashing of U.S. Postal International Money Orders in Mexico. . . . We are sure that, as a group, we can arrive at a mutual agreement for our processes. As you will recall, during the Washington meeting we identified the issues and made suggestions to address those issues. We received your letter of items to be worked on, and based on your response to our previous letter, understand that you would like further clarification.
>
> * * * * *
>
> We would also like your determination that U.S. International Postal Money Orders will be cashed shortly. It is our intent, as we agreed in our meeting, to work on the following issues:
>
> * * * * *
>
> Our intention is to work with the Banks and Casas of Mexico in order to benefit our money order customers, both the purchaser and the payee. Although all of the above items may not be completed at once, they are points for the working together group to begin discussions and serious efforts to resolve.

January 14, 1998, letter from Jayne Schwartz and James M. Parrott to Manuel Abreu and Jamie Schabes ("January 14 letter") (Exhibit B) (emphasis added).

The third meeting occurred on January 21, 1998, and representatives from the Exchange Houses met with USPS officials in St. Louis, Missouri to review the "list of anomalies" prepared by the Exchange Houses. Amended Comp. at ¶ 71. The Exchange Houses claim that at the meeting, the USPS representatives confirmed which points in the list of anomalies would provide a basis for reimbursing the Exchange Houses for the reclamations. Id. They also contend that the USPS agreed that seventeen of the irregularities on the reclamation list "would serve as a basis for either cancelling invoices directed to the Exchange Houses or actually reimbursing the money orders that had been previously paid." Finally, plaintiffs set forth a series of "proposals" [that is plaintiffs' term, not defendant's] made at this January 21, 1998, meeting. See ¶¶ 71a-71i.

Minutes were compiled concerning this meeting. See Agenda, January 21, 1998 (Exhibit C). These minutes state that "[a]fter discussion, the following items are proposal [sic]," (emphasis added) and then goes on to list ten items. Id. The document appears to address matters taken up when the meeting reconvened on January 23, 1998, and states that "[t]his solution as well as any and all proposals in this entire effort will require concurrence from Jayne Schwarz." Id. (emphasis added). Moreover, the notes went on to state:

> The question of when the Association will begin cashing Postal Money Orders was put on the table. Casas are concerned about the amount of money lost, it will help hasten their ability to accept money orders if USPS can provide **written commitment** of how the USPS will reimburse for claims already presented and step by step instruction documenting how the claim process will continue in the future. They are looking for this agreement as soon as possible, once this agreement is presented to them, they will have a meeting with their membership and will give the Postal Service a date.

Agenda for January 21, 1998, meeting (Exhibit C) (emphasis added).

The fourth and final meeting was held on February 3-4, 1998, in Mexico City. Amended Comp. at ¶ 73. Plaintiffs state that the matters discussed at this meeting included the results of the St. Louis meeting on January 21, 1998, reimbursement procedures, "watch and accept"

procedures, and the drafting of a frame agreement for crediting accounts or payment for past claims. Id. Plaintiffs allege that "[a]t the February 3-4 meeting in Mexico City, the participants entered into and ratified several previous agreements, including one stipulating that reimbursements for the reclamations already made would proceed in various phases, with Phase 1 allowing claims based on points 1, 2, 4, 11, 12, 13, 14, 17, 20, 22, 29, 30, 35, 40, 45, and 48 from the 'list of anomalies.'" Amended Comp. at ¶ 79. The plaintiffs claim that these agreements resulted in their agreeing to resume the purchase of U.S. postal money orders. Id.

The minutes following this meeting state:

> Upon conclusion, Lic. Schabes asked the CEOs if they would be interested and willing to purchase US Money Orders again.
>
> In answer to Ms. Schabes' question Lic. Hector Lagos stated that, considering the outcome of the negotiations held and their present status, our Sector should be willing to reinitiate purchasing these instruments again immediately. After discussion, all the CEOs confirmed their willingness to buy Money Orders again, provided that there should exist an instrument that makes official all the agreements reached. Therefore, upon execution of such a document they will reinitiate the purchase of Postal Money Orders.
>
> The attendants expressed their appreciation for the presence and good will showed by Mr. James Parrot, Associate Counsel Officer of the Chief Inspector, as well as by Miss Jayne Schwarz, Mgr. Corporate Accounting Finance, throughout the above negotiation period. We expect to receive from the USPS a document containing all the above agreements.

See Minutes, Subject United States International Postal Money Orders at 7 (Exhibit D) (English translation) (emphasis added). No such document containing the alleged agreements was ever prepared or executed, and plaintiffs do not allege to the contrary.

Plaintiffs claim that this series of meetings, "taken together with the correspondence and memoranda contemporaneously exchanged between representatives of both parties, constitute the terms of the agreement between the Exchange Houses and the USPS regarding the USPS's

reimbursement of the reclamation charges." Amended Comp. at ¶ 80. The Plaintiffs claim that they "agreed to continue accepting and processing USPS money orders in reliance upon the USPS's acknowledgment, promise and representations that the list of anomalies presented by the Exchange Houses' representatives contained valid bases for reimbursement of claims, and the USPS's expressed agreement to timely reimburse the Exchange Houses for reclamations already made based on the Exchange Houses' 'list of anomalies' and the USPS's agreement to return all original money order documents to the Exchange Houses for postal money orders where reclamations were not to be reimbursed." Id. at ¶ 81.

E. Plaintiffs' Claim Of Breach

The Exchange Houses claim that the USPS never performed under the various agreements allegedly reached at this series of meetings and as set forth in the resulting correspondence. Amended Comp. at ¶¶ 83, 86, 88. The "Failure to Perform" section of the Amended Complaint first describes a "protest letter campaign" that was initiated by the Mexican Exchange Houses and their correspondent United States banks "after further negotiations . . . failed" in order to prompt the USPS to implement the alleged new procedures and adhere to due diligence guidelines for dealing with suspicious affidavits. They claim that the USPS never responded to the protest letters, which allegedly did "delay other [unspecified] efforts by the Exchange Houses to bring claims against the USPS." Id. at ¶¶ 84-85.

The Amended Complaint lists one Count, captioned "Breach of Contract With Respect to USPS' Failure to Perform Under Its Agreements With and Representations to the Mexican Exchange Houses." Amended Comp. at page 37. The plaintiffs claim that "[t]he important agreements reached during the meetings between representatives from the USPS and Exchange Houses, taken together with the correspondence and memoranda exchanged between

representatives of both parties, constitute the terms of the agreement between the Exchange Houses and the USPS, regarding the USPS's reimbursement of the reclamation charges incurred by the various exchange houses." Id. at ¶ 94. The plaintiffs then claim a variety of "breaches" ranging from claims that the USPS failed to perform under these alleged agreements, that the USPS failed to reimburse the plaintiffs for any of the money order reclamations, and that the USPS ignored the letters and emails that were part of their protest campaign. See id. at ¶¶ 95-103. As relief, plaintiffs seek actual and compensatory damages, prejudgment and post-judgment interest, attorneys fees, and costs. Id. at ¶¶ 104-07.

## ARGUMENT

### I. Standards of Review

The central provision granting consent to suit in this Court is the Tucker Act, 28 U.S.C. § 1491. United States v. Testan, 424 U.S. 392, 397 (1976); Aetna Casualty & Surety Co. v. United States, 228 Ct. Cl. 146, 151, 655 F.2d 1047, 1051 (1981). Pursuant to the Tucker Act, an action may be maintained in this Court only if it is "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a).

Pursuant to Rule 12(b)(6), the Court may dismiss a complaint if, as a matter of law, it fails to state a claim upon which relief can be granted, even assuming the truth of its allegations. As the United States Supreme Court has held, dismissal for failure to state a claim is appropriate whenever "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

In resolving a motion to dismiss for failure to state a claim, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Kinne v. United States, 21 Cl. Ct. 104, 107 (1990) (quoting Scheuer, 416 U.S. at 236). Thus, the Court "must . . . indulge in all reasonable inferences in favor of the nonmovant." Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991). Nonetheless, the Court should not place any weight upon any assertions in the complaint other than allegations of fact, because "legal conclusions, deduction, or opinions couched as factual allegations are not given a presumption of truthfulness." Rochman v. United States, 27 Fed. Cl. 162, 168 (1992) (citation omitted).

II. The Court Does Not Possess Jurisdiction Over Plaintiff's Alleged Contract Claim Because Plaintiffs Have Not Satisfied The Jurisdictional Prerequisites Of The Contract Disputes Act

Before the district court, plaintiffs argued that the contract alleged in their complaint was not subject to the Contract Disputes Act. The district court held to the contrary. Arbitraje Casa de Cambio, S.A. v. U.S. Postal Service, 2004 WL 3257073, *3 (D.D.C. 2004).

The CDA applies to all executive agency contracts for "(1) the procurement of property, other than real property in being; (2) the procurement of services; (3) the procurement of construction, alteration, repair, or maintenance of real property; or (4) the disposal of personal property." 41 U.S.C. § 602(a) (2000). Assuming that the facts alleged in the complaint are true, as this Court must do on a motion to dismiss, the plaintiffs allege that they agreed to continue accepting and processing USPS money orders in exchange for, among other things, an agreement to reimburse plaintiffs for reclamations already made. See Amended Comp. at ¶ 81. These allegations support a conclusion that the alleged contract was for the procurement of services, and, therefore, bound by the requirements of the CDA.

This Court does not possess jurisdiction to entertain contract claims subject to the CDA unless there is both a valid claim and a contracting officer's final decision on that claim. James M. Ellett Const. Co., Inc. v. United States, 93 F.3d 1537, 1541-42 (Fed. Cir. 1996). Plaintiffs' Amended Complaint fails to allege that a claim was made or that a contracting officer's final decision on a claim was issued. In the absence of a claim, the Court does not possesses jurisdiction to entertain this case.

III. In The Alternative, The Alleged Contract Is Not Within The Court's Jurisdiction Because The Government Was Acting In Its Sovereign Capacity

The alleged contract that forms the basis of plaintiffs' complaint does not give rise to a suit for money damages because the United States was acting in its sovereign capacity. See Kania v. United States, 227 Ct. Cl. 458, 650 F.2d 264, 268 (1981).

In Kania, the plaintiff agreed to testify before a grand jury against his former employer in exchange for a promise that he would not be prosecuted for his activities while employed. 650 F.2d at 266. After testifying before the grand jury, the plaintiff was indicted for his prior criminal activities. Id. As a result, the plaintiff brought an action for damages against the Government for breaching its agreement not to prosecute him. The court dismissed the action for lack of subject matter jurisdiction, explaining that "[t]he contract liability which is enforceable under the Tucker Act consent to suit does not extend to every agreement, understanding, or compact which can semantically be stated in terms of offer and acceptance or meeting of the minds." 650 F.2d at 268. The court further explained that the United States has generally waived sovereign immunity with regard to proprietary contracts, in which "the sovereign steps off the throne and engages in purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves." Id. However,

the Government has not waived sovereign immunity for contracts that it makes in its sovereign capacity. Id.

Assuming solely for the purpose of this motion that the alleged agreements reached between representatives of the USPS and the Exchange Houses, taken together with the correspondence exchanged between them, represent a contractual commitment by the United States, this contract was made in the Government's sovereign capacity. When the USPS issues money orders, it "exercises a governmental function" and "stands in its position of sovereignty;" it is not a commercial transaction. Bolognesi v. United States, 189 F. 335, 336 (2d Cir. 1911). As explained in Bolognesi, in 1872, Congress established a money order system to be administered by the USPS "'[t]o promote public convenience, and to insure greater security in the transfer of money through the mail'" (citing Rev. St. Sec. 4027, U.S. Comp. St. 1901, p. 2741). This system "serves the public by furnishing a safe and cheap method for transmitting small sums of money. It carries on the system not for gain, but to supply a public need. It does not engage in business, but stands in its position of sovereignty." 189 F. at 336. The corollary to this principle that the issuance of money orders is a Governmental function and not a commercial transaction is that money orders are not negotiable instruments, subject to the defenses of holders in due course. Id.; accord Lewin v. United States, 145 Ct. Cl. 249, 170 F. Supp. 646, 648 (1959) (money orders are not negotiable instruments).

The court in United States v. Northwestern Nat. Bank & Trust Co., 35 F. Supp. 484 (D. Minn. 1940), expanded upon the conclusion that the postal money order system was a sovereign function:

> The establishment of the money order system is concededly within the constitutional powers wherein the Government is vested with the right to 'establish Post Offices and post Roads.' Const. art. 1, Sec. 8, cl. 7. It is incident to the paramount right of Congress to

> maintain a post office system. While the growth of the money order system may have assumed some aspects of commercial banking, it must nevertheless by characterized as a function of sovereignty and not a commercial operation. The operation of the post office system, with its many innovations inaugurated to meet a great public need, does not divest it of its character of sovereignty. When postal money orders are issued, the primary object is to further the safety of the postal system; to insure the sanctity of the mails from loss and theft which more frequently occurs when currency is transmitted through the mails.

35 F. Supp. at 486. See also Stewart v. United States, 300 F. Supp. 1047, 1049 (E.D. Mich 1969) ("The operation of the postal money order system is a 'sovereign function' and not a 'commercial operation', notwithstanding it may have some aspects of commercial banking"); Currency Services v. Matthews, 90 F. Supp. 40, 43 (W.D. Wis. 1950) ("it seems well established that issuance of United States post-office money orders is a governmental rather than commercial function"); Ronald A. Anderson, Anderson on the Commercial Code, § 3-104:61 (3d ed. 1991-94) ("In the operation of the money order system, the government does not engage in business but stands in the position of a sovereign supplying a public need.").

Indeed, plaintiffs fully understand that the operation of the money order system is a function of sovereignty. In the district court proceeding, plaintiffs contended: "In Mexico, the postal money orders were widely accepted as a pre-paid cash instrument carrying the full faith and credit of the U.S. Treasury." Plaintiffs' Brief in Response to Defendants' Motion to Dismiss, or, in the Alternative for Tranfer (Case No. 02-0777, filed July 9, 2004) ("Plaintiffs' Dist. Ct. Br.") at 2 (available on PACER, document 39).

In its Amended Complaint, plaintiffs allege that the USPS agreed, among other things, to consider "the reduction of the claim period," to establish a "'watch' procedure," to consider "reducing expiration dates for U.S. Postal Money Orders," to consider "implementing a guarantee system," to consider "'[r]equiring certain forms of identification to be used when

cashing money orders," and to consider requiring refund claimants to submit notarized signatures. Amended Comp. ¶ 69. Each of these alleged agreements relates directly to the issuance of USPS money orders and the related claims process, and addresses issues affecting the reliability of the money order system, all of which are part and parcel of the sovereign function to operate a money order system. They are not the type of transactions such as private parties engage in among themselves. Indeed, there is no comparable claims procedure in the commercial context. Thus, the alleged agreements at issue in this case cannot be construed as part of a commercial operation.

IV. Plaintiffs' Claims Do Not Meet The Jurisdictional Requirements For Contracts Made In The Government's Sovereign Capacity

Because the alleged contract at issue was made in the Government's sovereign capacity, the Court possesses jurisdiction only if (1) the person who made the contract on behalf of the Government had authority to bind the Government to pay money damages, and (2) the language of the contract provides for the payment of money damages in the event of a breach by the Government. Kania v. United States, 227 Ct. Cl. 458, 650 F.2d 264, 268 (1981). In Sanders v. United States, 252 F.3d 1329 (Fed. Cir. 2001), the Federal Circuit explained that liability on a claim for breach of a contract entered into by the Government in its sovereign capacity "could only exist if there was an unmistakable promise to subject the United States to monetary liability. This would require the same kind of express language (in both written and oral agreements) required by the unmistakability doctrine concerning government liability for the exercise of sovereign power." 252 F.3d at 1336.[6] Thus, for the Government to be held liable for breach, a

[6] The unmistakability doctrine recognizes that "'sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.'" Klamath Irrigation Dist. v. United States, 67 Fed. Cl. 504, 536 n. 57 (2005) (quoting Bowen v. Pub.

contract made in the Government's sovereign capacity must provide for the payment of damages in unmistakable terms.

In this case, plaintiffs have not even alleged that a representative of the USPS had authority to enter into the alleged contract. Moreover, there is no allegation that a USPS representative had authority to bind the Government to pay money damages.

Furthermore, the plaintiffs do not allege that the purported contract "clearly and unmistakably subjects the government to monetary liability for any breach." Sanders, 252 F.3d at 1335. Indeed, the allegations in plaintiffs' complaint setting forth the purported contract does not set forth any remedy for a breach.

## V. In The Alternative, Plaintiffs Have Not Alleged Facts Sufficient To Show That A Contract Existed

The plaintiffs' complaint does not state whether the alleged contract between the Exchange Houses is express or implied-in-fact. "An express contract is an agreement or mutual assent by the parties manifested in words, oral or written." People's Bank & Trust Co. v. United States, 11 Cl. Ct. 554, 566 (1987). An implied-in-fact contract is "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." Baltimore & Ohio R.R. Co. v. United States, 261 U.S. 592, 597 (1923). Whether alleging the existence of an express or an implied-in-fact contract, however, the plaintiffs have the burden of proffering evidence establishing the required elements of a contact: "a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." Total

---

Agencies Opposed to Social Security Entrapment, 477 U.S. 41, 52 (1986)).

Med. Mgmt., Inc. v. United States, 104 F.3d 1314, 1319 (Fed. Cir. 1997). To state a claim upon which relief can be granted, plaintiffs must allege facts, which if proven, would permit plaintiffs to prevail under either an express or implied contract theory, and breach of that contract. Trauma Service Group v. United States, 104 F.3d 1321, 1325-27 (Fed. Cir. 1997).

As a threshold matter, plaintiffs' Amended Complaint does not identify who with authority to bind the USPS entered into the alleged contract. In Federal Crop Insurance Corporation v. Merrill, 332 U.S. 380 (1947), the Supreme Court established two controlling principles of Government contract law. First, the Court held that the Government is not bound by the acts of its agents unless such agent is acting within the limits of his actual authority. Federal Crop Insurance Corporation, 332 U.S. at 384. Second, the Court held that anyone entering into a contract with the Government takes the risk of "having accurately ascertained that he who purports to act for the government stays within the bounds of his authority." Id.

In the district court proceeding, plaintiffs averred that "Jayne Schwarz was the authorized representative who contracted with the [plaintiffs] on behalf of the USPS." Plaintiffs' Dist. Ct. Br. at 29. Ms. Schwarz attended the meetings on December 10, 1997, and February 3-4, 1998. The only documents authored by Ms. Schwarz were the December 23 letter and the January 14 letter. Exhibits A and B. Ms. Schwarz did not attend the meetings on November 25, 1997, or January 21, 1998. Amended Comp. at ¶¶ 66, 72. Accordingly, any agreements allegedly reached at those meetings would not have been entered into by anyone with authority to bind the Government.[7]

---

[7] The Government does not concede that Mr. Schwarz possessed the authority to enter into any alleged contract. However, solely for the purposes of this motion to dismiss, the Government will treat plaintiffs' allegations as true. If defendant's motion to dismiss is denied, defendant reserves the right to contest the allegations that Ms. Schwarz was authorized to contract with plaintiffs.

The formation of a contract also requires, at a minimum, a meeting of the minds on all material terms and an intent to be bound. See, e.g., Krigel v. United States, 229 Ct. Cl. 73, 662 F.2d 741, 746 (1981); Franklin Sav. Corp. v. United States, 56 Fed. Cl. 720, 743 (2003), aff'd, 97 Fed. Appx. 331 (2004); Restatement (Second) of Contracts § 20 (1979). Here, there is no written contract executed by the parties, and plaintiffs are relying upon the notion that the set of meetings and subsequent correspondence can be construed as a contract. The Amended Complaint, however, does not demonstrate that a meeting of the minds occurred, or that there was an intent to be bound.

Indeed, plaintiffs cite only two letters from the USPS, which clearly contradict the notion of a meeting of the minds. For example, after the second meeting, Ms. Schwarz sent a letter to plaintiffs stating that their meeting "was productive and a very good start to finding solutions . . . . I agree that we need to have a letter of intent . . . . Hopefully, we can draft the final letter after our meeting in late January 1988. . . . Since we do not have the answers now, it is not possible to draft the final letter of intent." Ex. A. The second letter sent a few weeks later, states: "We are sure that, as a group, we can arrive at a mutual agreement for our processes." Ex. B. Documents prepared by the plaintiffs similarly reflect the absence of any intent to be bound. Minutes prepared by plaintiffs after the third meeting state that "[t]his solution as well as any and all proposals in this entire effort will require concurrence from Jayne Schwarz," and that plaintiffs would not begin to accept money orders until the "USPS can provide written commitment of how the USPS will reimburse for claims already presented and step by step instruction documenting how the claim process will continue in the future." Ex. C. The plaintiffs' insistence upon a written agreement is reflected in their minutes of the fourth and final meeting: "After discussion, all the CEOs confirmed their willingness to buy Money Orders again,

provided that there should exist an instrument that makes official all the agreements reached. Therefore, upon execution of such a document they will reinitiate the purchase of Postal Money Orders." Ex. D.

Moreover, in the Amended Complaint, the plaintiffs characterize the fruits of the meetings as a "Pilot Program," see Amended Comp. at ¶¶ 87, 100, indicating that there was not a bona fide contractual agreement, but rather a simple series of discussions to find a solution to the problems that the Exchange Houses had suffered due to the volume of the reclamations in the mid 1990s. Plaintiffs themselves state that "further negotiations concerning the list of irregularities failed." Id. at ¶ 84.

It is well-established that "[o]ral understandings which contemplate the finalization of the legal obligations in a written form are not contracts in themselves. When legal obligations between the parties will be deferred until the time when a written document is executed, there will not be a contract until that time." SCM Corp. v. United States, 219 Ct. Cl. 459, 595 F.2d 595, 598 (1979). Accord Saul Bass and Associates v. United States, 205 Ct. Cl. 214, 505 F.2d 1386, 1393 (1974) ("The intent of the parties, as always in the law of contracts, is determinative, the question being whether the parties intended not to be bound or whether either of them manifested an intent to the other not to be bound until a fully integrated contract had been executed"); Truckee-Carson Irr. Dist. v. United States, 14 Cl. Ct. 361, 370 (1988) ("It is axiomatic, however, that plaintiff cannot establish an implied-in-fact contract simply and merely through referring to evidence of extensive negotiations, without more, wherein the parties hoped to reach an agreement"). Given the plaintiffs' repeated statements that their performance was expressly conditioned upon the execution of a written agreement, no contract can be implied.

Moreover, plaintiffs allege that "the USPS never once performed under the various agreements and representations it made at its meetings and in its communications with the Exchange Houses." Amended Comp. at ¶ 31 (emphasis added). This is not a case, then, where assent to a contract can be implied by conduct indicating assent. Cf. Baltimore & Ohio R.R. Co. v. United States, 261 U.S. 592, 597 (1923) ("an agreement will not be implied unless the meeting of minds was indicated by some intelligible conduct, act or sign").

Finally, the purported terms of the implied contract alleged by plaintiffs are far too nebulous and vague to be binding. "The common law principle that a contract cannot be enforced if the terms are indefinite . . . retains a core of vitality." Goldstick v. ICM Realty, 788 F.2d 456, 461 (7th Cir.1986). As Chief Judge Posner explained in that case:

> If people want the courts to enforce their contracts they have to take the time to fix the terms with reasonable definitiveness so that the courts are not put to an undue burden of figuring out what the parties would have agreed to had they completed their negotiations. The parties have the comparative advantage over the court in deciding on what terms a voluntary transaction is value-maximizing; that is the premise of a free-enterprise system. This is not to say that enforcement should be denied if the parties by inadvertence failed to specify some peripheral term. Such omissions both are the unavoidable consequence of the limitations of human foresight and can be repaired by the courts without undue difficulty. But in this case essential terms were missing[.]

Id. at 461 (cited with approval in Hamilton Securities Advisory Services, Inc. v. United States, 60 Fed. Cl. 144, 144-45 (2004)). See also Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 202 (Fed. Cir. 1992) ("In the absence of contractual intent or sufficiently definite terms, no contractual obligations arise"); cf. Garza v. United States, 34 Fed. Cl. 1, 15-16 (1995) (refusing to find the existence of an enforceable contract where the agreement contained only general terms). "[T]he terms of a contract must 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Bel Pre Health Care Ctr. v. United States, 24 Cl.

Ct. 495, 496 (1991) (quoting Restatement (Second) of Contracts § 33(2) (1979)), aff'd, 980 F.2d 745 (Fed. Cir. 1992).

One need only look at all the varied claims of breach alleged by plaintiffs to show the complete lack of definiteness in the purported contract. See Amended Comp. at ¶¶ 93-103. They claim "breaches of the contractual obligation" set forth in the January 14, 1998, letter, id. at ¶ 95, even though that letter, on its face, does not say that any contract has been executed: to the contrary, it states only that the individuals present at the meetings had "outlined" the issues. See Exhibit B. The Exchange Houses also claim that in a December 10, 1997, meeting, Jayne Schwartz represented that the USPS had a fund that could be used to reimburse the plaintiffs. See Amended Comp. at ¶ 77. Notably, they do not allege that the USPS ever promised that the plaintiffs would be reimbursed in full from the fund, yet they still list the mere representation that a fund existed as a "contractual obligation" that was "breached." See id. at ¶ 96. Plaintiffs also claim that the USPS breached a contract by terminating the "Pilot Program," id. at 100, but they cite no evidence that the program could not be terminated by one or both of the parties. The very name "Pilot Program" inherently indicates that it is a program to be tried on a limited time basis to see if it will prove successful. Plaintiffs also include an allegation about a claim for $97,405 concerning a stolen mail bag, yet make no effort to connect that up to any of the "agreements" reached in the meetings. See id. at ¶ 102.

Federal contract law has long required that a document relied upon to prove a contract with the United States must be sufficiently definite to be mutually enforceable and indicative of a mutual assent to be bound. See Willard, Sutherland & Co. v. United States, 262 U.S. 489, 493-94 (1923) (contract that did not require the Government to purchase any stated quantity was void for want of mutuality, but was enforceable to the extent it had been performed); Coyle's Pest

Control, Inc. v. Cuomo, 154 F.3d 1302, 1305-06 (Fed. Cir. 1998) (court would not add a term to make the contract one for a minimum quantity or a requirements contract where no quantity was specified). As held by the Claims Court, "where the obligation to be enforced has [not] been fixed with reasonable certainty by the terms of the parties agreement ... there can be no basis for deciding whether the agreement has been kept or broken; the definiteness necessary for enforceability is lacking." Pre Bel Health Care Center, Inc., 24 Cl. Ct. at 496. See also Commonwealth of Kentucky v. United States, 27 Fed. Cl. 173, 178-79 (1992) ("Memorandum of Understanding" which set forth the terms and conditions under which the United States would transfer ownership of several dams to a state environmental agency was not a binding contract because "there are no provisions stating that the MOU is binding, . . . nor did the parties provide a remedy in case of breach"). Taken in their entirety, the allegations set forth in the Amended Complaint are insufficient to demonstrate a prima facie showing of a contract between the plaintiffs and the USPS, and, therefore, the complaint should be dismissed for failure to state a claim upon which relief may be granted.

## CONCLUSION

The alleged contract set forth in plaintiffs' complaint is not subject to this Court's jurisdiction. The promises alleged to have been made by the Government were in its sovereign capacity to operate its money order system. They were not made for the purpose of purchasing goods or services. Additionally, the alleged contract does not contain an unmistakable promise to subject the Government to monetary liability. Therefore, defendant respectfully requests that the Court dismiss plaintiffs' complaint for lack of jurisdiction.

If the Court finds, however, that the alleged contract was made by the Government in a proprietary capacity, then the contract alleged by plaintiffs constituted a procurement of their

services, and the contract is subject to the requirements of the CDA. In this case, the plaintiffs did not present a claim to a contracting officer for a final decision, and, accordingly, the Court does not possess jurisdiction to entertain the claims. Finally, if the Court finds that it does possess jurisdiction to entertain plaintiffs' claim, the United States respectfully requests that this Court dismiss the plaintiff's complaint for failure to state a claim upon which relief may be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Mark A. Melnick
MARK A. MELNICK
Assistant Director

s/ Doris S. Finnerman
DORIS S. FINNERMAN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Department of Justice
Tel: (202) 307-0300
Fax: (202) 305-7643

Attorneys for Defendant

Of Counsel
GARY SHAPIRO
Senior Litigation Counsel
United States Postal Service

April 10, 2006

# EXHIBIT A

UNITED STATES
POSTAL SERVICE

December 23, 1997

Messrs. Manual Abreu
President
and
Jaime Schabes
Vice President Independent Sector
Association Mexicana de
Casas de Cambio A. C.

Gentlemen:

It was a pleasure meeting with both of you, and the other members of your delegation in Washington, DC. I think the meeting was productive and a very good start to finding the solutions to problems relating to the acceptance of International United States Postal Money Orders for negotiation by exchange houses in Mexico. It is important to maintain the open dialogue we have had in order to facilitate the duties we have outlined for ourselves.

I agree that we need to have a letter of intent to outline the parameters of our working group. Your letter of December 18, 1997, outlines, in principle, our discussion at the meeting in Washington and is an excellent starting point. Hopefully we can draft the final letter after our meeting in late January 1988. By breaking up into smaller work groups, it is more likely that we will find solutions and implement a workable plan. Since we do not have the answers now, it is not possible to draft the final letter of intent. We agreed to examine each of the points discussed to determine the feasibility of implementation. The possibility of implementation will be clearer after our next meeting.

In addition to the recommendations you have suggested, we have sent you a draft of a notice which will be conspicuously posted at post offices that sell large numbers of money orders for negotiation in Mexico. The information on the notice will also be given to customers who purchase Postal Money Orders for negotiation in Mexico. We will begin this process of notification once the exchange houses begin accepting the postal money orders again. We think that with this notice and the willingness of the exchange houses in Mexico to obtain photocopies of identification, we will be making a giant step forward in improving the situation.

I look forward to our next meeting and to hearing the reports from the groups who undertook special projects. In the meantime, I think that exchange houses in Mexico should start the process of accepting Postal Money Orders with the assurance that we are working as diligently as possible to streamline the process and make it as workable as possible. Please feel free to contact any member of the group at any time.

Sincerely,

Jayne Schwarz

Jayne Schwarz, Manager
Corporate Accounting
Finance

475 L'Enfant Plaza SW
Washington DC 20260

EXHIBIT
A

# EXHIBIT B

UNITED STATES
POSTAL SERVICE

January 14, 1998

Mr. Manuel Abreu
President
Asociacion Mexicana de Casas de Cambio A.C.

Mr. Jaime Schabes
Vice President
Independent Sector

Dear Messrs. Abreu and Schabes,

Thank you for joining us in the Washington DC area to outline issues needed to enable cashing of U.S. Postal International Money Orders in Mexico. It was a pleasure working with you and your group. We are sure that, as a group, we can arrive at a mutual agreement for our processes. As you will recall, during the Washington meeting we identified the issues and made suggestions to address those issues. We received your letter of items to be worked on, and based on your response to our previous letter, understand that you would like further clarification.

Mr. Edward Brown, U.S. Postal Service Manager of the St. Louis Accounting Service Center is our point of contact for issues concerning claims. His office is responsible for information and claims on cashed money orders. They, however, do not issue money orders under the direct money order service. Mr. Brown can be reached at 314-436-6950.

We would also like your determination that U.S. International Postal Money Orders will be cashed shortly. It is our intent, as we agreed in our meeting, to work on the following issues:

1. The U.S. Postal Service will not automatically debit your correspondence bank, or collect on our international postal money orders during a grace period that we propose to expire March 31, 1998. This should provide adequate time to establish an agreed upon process. We also proposed to establish a separate group in Mr. Ed Brown's St. Louis Accounting Service Center to review claims and fax them to a central location designated by you. We further agreed that we would not debit your account for a period of time (suggested 72 hours) in order for you to provide documentation. If we had not heard from your centralized point within the established period of time, only then would automatic debits occur.

2. A review to determine the appropriate reduction of the claim period from the current two years is already underway. We believe we can present our proposal during the meeting that the group agreed to hold later this month.

3. As you may recall, Mr. Edward Brown our manager of the St. Louis Accounting Service Center volunteered to host your Casas representative in St. Louis. Along with a member of his staff in St. Louis these individuals will review all claims that you have returned in order to determine their validity for reimbursement. We welcome your participation. This effort can begin at your convenience.

... Plaza SW
... DC 20260

EXHIBIT
6

4. A committee was named in order to return original items to the Mexican financial institutions. We understand that you need original documents in order to proceed collecting these items through the proper legal channels. During our December meeting, we suggested that the committee of James Parrott, Ruben Trevino, and Manuel Abreu report on resolution of this issue at the next joint working together meeting. We believe that this issue can be readily completed with the development of a methodology letter.

5. Establishment of a written and watch procedure. The buyer talks have been developed by Diana McWhite of the U.S. Postal Service. We can jointly review the buyer's and cashing agent's watch procedures. We also agreed to establish a work team to determine the feasibility of implementing a guarantee that the payer will know for sure that an item will not be returned in two years for a fraudulent endorsement. This work team was to consider required identifications that could be used when cashing money orders and sent to the US for claims processing. This group will also specify requirements that both the claimant in the United States and the payee in Mexico of a non-received or improperly negotiated U.S. International Postal Money Order be required to have their signatures notarized. We agreed that this work group should include Ed Brown, Jayne Schwarz, Inspectors Ruben Trevino and Jim Parrott from the U.S. Postal Service, and Manuel Abreu, Jaime Schabes, and Luis Esteve from Mexico. It was suggested that each country develop requirements and costs in order to begin telephonic discussions. Recommendations are to be presented to the joint working group.

The claims processing procedure will be led by Mr. Brown, and reviewed at the next working meeting.

At our December 1997 meeting, we discussed expiration dates on U.S. Postal International Money Orders. It was suggested that the expiration be reduced. Since these money orders may be cashed worldwide, we need to consider the length of time required for transit in all parts of the world. Additionally, creation of a separate bank routing symbol to identify money orders from Mexico was suggested for review.

Our intention is to work with the Banks and Casas of Mexico in order to benefit our money order customers, both the purchaser and the payee. Although all of the above items may not be completed at once, they are points for the working together group to begin discussion and serious efforts to resolve. We look forward to meeting very soon.

Sincerely,

Jayne Schwarz, Manager
Corporate Accounting
[illegible]nce

James M. Parrott
United States Postal Inspection Service

# EXHIBIT C

FROM : INVERLAT MKT DIN PHONE NO. : 3253345 Feb. 24 1998 10:55AM P2

AGENDA
January 21, 1998

Attendees:
Lic. Manuel Abreu Vargas
Jaime Schabes
Luis Esteve de Murga
Edward L. Brown
Ramon Cuffie
Sandra Bevelry
Patsy Liszewski
Connie White

The St. Louis 306 process from purchase of 6401 to obtain a copy of a money order, to completion of the 306 by the purchaser and beneficiary (payee); to the decision making activities and finally the billing cycle was explained by Mr. Brown.

The organizational structure of the financial institution and the money order cashing process with the casa des cambios in Mexico was explained by Mr. Schabes.

After discussion, the following items are proposal:

1. **The purchaser requesting the 6401 must present photo id and customer receipt. An USPS action will be to destroy yellow 6401 and force compliance with the white 6401.**

2. **The purchaser will not be paid nor the bank billed until the payee's signature has been verified by the Association or the agreed upon time limit has expired without comment by the Association.**

3. **Set time limit of seven days that the Association must respond to the 306.**

4. **The purchaser will be responsible for the authentication of signature of purchaser and payee by providing documentation, i.e., driver's license, passport, state id, military id, or alien id in the US and passport, voter registration or military service in Mexico.**

5. **ASC will return claims with if items determined critical on the form have not been completed.**

6. **Modify the 306 form to include statement that purchaser will be held responsible for authentication of both signatures.**

7. **Modify the 306 form to include language in payee portion of the form that will have authority if the form is sent to a foreign country.**

8. **USPS will explore ways to indicate the country the direct service money order (7000 series) will be sent.**

9. **Discuss with Alesevich of Law Department statement on customer receipt and clarification if both sides are not filled out is it automatic denial.**

10. Discuss with Legal if we can impose a time limit for purchaser to return the claim.

EXHIBIT
C

On January 23, 1998, reconvened discussing and refining the attached sheets on claim codes matrix. Also, there was discussion concerning the expiration date of March 31, 1998. The Messrs Abreu, Schabes, and Vargas will respond to Ms Schwartz. The 72 hours and fax not feasible as itemized in 1 of the letter, it was agreed buy the group to have a seven day response time and Express Mail the 306 forms to the Association.

On the issue of bills already created, we will review the receivable from the Association and make determination. If there are discrepancies we will discuss with Association item by item. The Association will concentrate all receivable claims from the casas, sorted by codes used in the matrix, package number, and casa. The receivable that the Association has received will be sent to Sandra Beverly, St. Louis Accounting Service Center, United States Postal Service, PO Box 82425, St. Louis MO 63182-2425. If MOB receives any questions or receivable forms from other than the Association, we will return to bank and have them contact the Association.

What is still at issue: if the decision is made after our review to cancel the bill, there are internal accounting and payment issues that must be addressed and set up.

The three members of the meeting from the Association represented both the casas and the banks.

This solution as well as any and all proposals in this entire effort will require concurrence from Jayne Schwarz.

The issue of how to handle claims for DINEX. For those we already have, we will review. Future Dinex must come through the Association.

The question of when the Association will begin cashing Postal Money Orders was put on the table. Casas are concerned about the amount of money lost, it will help hasten their ability to accept money orders if USPS can provide written commitment of how the USPS will reimburse for claims already presented and step by step instruction documenting how the claim process will continue in the future. They are looking for this agreement as soon as possible, once this agreement is presented to them, they will have a meeting with their membership and will give the Postal Service a date.

Meeting adjourned.

# EXHIBIT D

# AGENDA
# USPS MEETING
# MEXICO
**February 3 & 4, 1998.**

## PARTICIPANTS USPS
*Mr. James Parrot*
*Mrs. Jayne Schwarz*
*Mr. Kurt*

## PARTICIPANTS AMCC
*Mr. Manuel Abreu*
*Mr. Eduardo Garcia Lecuona*
*Mr. Luis Esteve*
*Mr. Jaime Schabes*

## PARTICIPANTS ABM
*Mr. Pedro Zorrilla*
*Mr. Hector Cordero*
*Other participants to be confirmed*

## *AGENDA*

Tuesday February 3, 1998

| Time | Activity or Event | Items to Review | Location |
|---|---|---|---|
| 8:30 AM 'till 9:45 AM | Breakfast Meeting | Review results of last meeting in St. Louis and feasibility of the agreements reached with Edward Brown and his staff. | La Veranda Restaurant at the Maria Isabel Sheraton Hotel. |
| 10:15 AM until Lunch time at 2:00 PM | Meeting | Discussions of the reimbursement procedure. Define Correspondent Banks participation. Crediting accounts vs. Actual payment to the Mexican institution. | AMCC Premises |
| 2:00 PM | Lunch | | To be defined |
| 4:00 PM | Meeting | Acceptance. Watch and accept procedure. Responsibilities and limitations. Definition of physical characteristics of the IPMO to be reviewed. Other considerations. Marketing issues. | AMCC Premises |

EXHIBIT

Case 1:05-cv-00217-LAS Document 15 Filed 04/10/2006 Page 42 of 47

Wednesday February 4, 1998.

| Time | Activity or Event | Items to Review | Location |
|---|---|---|---|
| 10:00 AM 'till Noon | Meeting with banking sector participants | Agreement on procedures established with Exchange Houses. Particular issues related to banks. Definition of the procedure for reimbursement with Mexican banks. | AMCC Premises |
| Noon 'till 2:00 PM | Meeting | Final details and drafting of a "Frame Agreement" amongst all participants. | AMCC Premises |
| 2:00 PM to 4:00 PM | Lunch | | To be defined |
| 5:00 PM | Final Meeting with Banks and Exchange Houses | Presentation of the "Frame Agreement Drafted" to all participants. Comments and revisions. | INVERLAT Auditorium |

4 de febrero de 1998.

# MINUTA

**ASUNTO: United States International Postal Money Orders.**

Con fecha 3 y 4 de febrero de 1998 se reunieron nuevamente los representantes de la Asociación Mexicana de Casas de Cambio, Asociación de Banqueros de México y United States Postal Service en la ciudad de México con la finalidad de puntualizar todos aquellos aspectos que se han venido manejando en torno a la problemática de los United States Postal Money Orders.

En la referida reunión se obtuvieron los siguientes resultados:

1. El plazo de 7 días hábiles que se había acordado en materia de reclamación, se amplía a 10 días hábiles, mismos que se deberán contar a partir de la fecha de recepción.

2. Se aceptó que la Asociación Mexicana de Casas de Cambio se constituya como el canal de envío y recepción de los documentos susceptibles de ser reembolsados conforme a la matriz de códigos de reclamación. Especificando que se planteó como alternativa para los bancos de que en un principio nuestra Asociación también funga como canal de envío y recepción para ellos.

3. Se dejó en claro que al margen de este problema, existen bancos que desde hace mucho tiempo no compran este tipo de Money Orders.

4. Se estableció que derivado de la matriz de códigos de reclamación, se apliquen varias fases para proceder a los reembolsos respectivos. En tal virtud, se constituyó la primera fase con los numerales 1-2-4-11-12-13-14-17-20-22-29-30-35-40-45 y 48.

Dicha reunión se desarrolló bajo el siguiente esquema:

El Lic. Manuel Abreu Vargas hizo la presentación formal de los representantes del United States Postal Service.

Los señores Lic. Jaime Schabes Llerenas y Lic. Luis Esteve de Murga procedieron a exponer una síntesis desde el inicio de las gestiones inherentes a la multicitada problemática. Resaltando la actuación conjunta que se realizó con la Asociación de Banqueros de México.

Acto seguido, explicaron ampliamente los diferentes aspectos vinculados con el trámite de reembolsos de aquellos Postal Money Orders que encuadran dentro de

la matriz de códigos de reclamación que contiene las 48 causales a que se han venido aludiendo sistemáticamente; aclarando que a esta fecha existen pequeños detalles pendientes de afinar.

Por otra parte, informó que se está acelerando la implementación del proceso de reclamaciones a futuro.

Retomando el asunto de las 48 discrepancias, ratificaron la conformidad de parte del United States Postal Service para considerar aquellos casos relacionados con las firmas; señalando los numerales 1-2-4-11-12-13-14-17-20-22-29-30-35-40-45 y 48 de tal suerte que el primer paquete de envío se referirá a este aspecto.

En este sentido, expresaron que el procedimiento a seguir se aplicará sólo al numeral mencionado y que cada Casa de Cambio clasificará por categoría para hacerlo más expedito, enviando dicho paquete a nuestra Asociación y ésta a su vez remitirá al United States Postal Service vía courier; anexando copia del formato 306 y del Money Order correspondiente.

De igual manera se confirmó que el único canal de envío y recepción será nuestra Asociación.

Así mismo hicieron mención del numeral 17 aclarando que sólo resulta válida la primera parte.

Por otro lado, reiteraron como un logro importante el hecho de que se consiguió que el United States Postal Service devuelva los Money Orders originales en aquellos casos que resulte procedente. Para tal efecto el Sr. Parrot enviará un formato de cómo deberán ser solicitados.

Posteriormente se abrió un espacio para intercambiar puntos de vista y llevar a cabo una breve sesión de preguntas y respuestas con fines de aclarar o despejar las dudas que se tuvieran.

En uso de la palabra la Srita. Jayne Schwarz especificó que en materia de Postal Money Orders susceptibles de ser reembolsados iniciarán con todos aquellos que comprenden el año de 1997.

Al respecto el Lic. José Antonio Gutiérrez de Velasco Hoyos formuló a los representantes del correo americano la propuesta consistente en que el plazo especificado por la Srita. Schwarz relativo al período de 1997 para efectuar los reembolsos, se incluya desde el 4º trimestre de 1996, esto es, octubre, noviembre y diciembre de 1996 y todo el año de 1997. Petición que fue acordada por todos los asociados.

En respuesta la señorita Jayne Schwarz indicó que lo someterán a consideración.

Habiendo concluido esta fase, el Lic. Jaime Schabes Llerenas cuestionó a los Sres. Directores acerca de si existe el interés y disposición de retomar la compra de los United States Postal Money Orders.

En respuesta el Lic. Héctor Lagos Dondé expresó que considerando los logros obtenidos y el estatus actual, nuestro sector debería de recomprarlos en forma inmediata. Previo intercambio de opiniones, la totalidad de los Directores Generales manifiestan su conformidad para proceder a la recompra de tales Money Orders con la salvedad de que previamente debe existir un documento que oficialice los acuerdos tomados y que una vez obtenido, al día siguiente reiniciarán la compra de los Postal Money Orders.

Por último se agradeció la presencia y buena voluntad demostrada durante todo el período de gestiones al Sr. James M. Parrot, Associate Counsel Office of the Chief Inspector y Jayne Schwarz, Manager Corporate Accounting Finance, quedando pendiente de recibir el documento en donde se consignen estos acuerdos.

**Secretario:**

**José Antonio Abel Ramírez Rodríguez**
**Director General**

**Presidente:**

**Manuel Abreu Vargas**
**Presidente del Consejo Directivo.**

Minutes

**Subject Unites States International Postal Money Orders**

On February 4. 1998, the representatives of the Mexican Association of Exchange Houses, Mexican Banking Association and US Postal Service in Mexico City, met in Mexico City for the purpose of pointing out the items that have been handled related to the US Postal Money Orders.

The following results were obtained in the above meeting:

1. The 7- working day claim period previously agreed, was extended to a 10- working day one, being counted upon reception date.
2. It was accepted the AMCC to be appointed as the forwarding and reception channel of all reimbursable documents, based on the claim code matrix. This alternative was considered for the banks, as well.
3. It was also cleared out that apart from the existing problem. some banks have not accepted these Money Orders for some time.
4. It was stated that based on the code claim matrix, several stages should be applied in order to proceed to the respective reimbursement. Therefore, the first tier was started under claim codes numbers: 1. 2, 3, 11. 12, 13, 14, 20, 22, 29, 30, 35, 40, 45 and 48.

A call to all CEOs of the Associated Exchange Houses was issued in order for them to attend an informative meeting at Casa de Bolsa Inverlat, last February 4th for the purpose of communicating the conclusions reached as a result of several working reunions held by our representatives. the representatives from the Mexican Banking Association and USPS representatives.

The above meeting was held a follows:

1. Lic. Manuel Abreu formally introduced the representatives from the United States Postal Service.
2. Lic. Jaime Schabes and Lic. Luis Esteve proceeded to summarize the negotiations related to the above mentioned issues, outlining the joint participation of the Mexican Banking Association with the AMCC.

Following they extensively explained every aspect related to the reimbursement process of those Postal Money Orders falling into the claim code matrix, containing 48 rejection causes being constantly mentioned, stating that as of to date there are still some details pending to fine tune.

On the other hand, they informed that the implementation of the future claim process is being expedited.

Regarding the 48 discrepancies, they confirmed the agreement of the USPS to consider those cases related with signatures, mentioned in numbers 1, 2, 4, 11, 12, 13. 14, 20, 22, 29. 30, 40, 45 and 48. Therefore the first package to be forwarded will be based on those codes.

They also indicated that the procedure to be followed will be applied only to the mentioned code and that every Exchange House should classify the money orders by category in order to make it expeditious. The package should be sent to our Association who will in turn, forward it to the USPS via courier, attaching copy of Form 306 as well as the corresponding Money Order.

Case 1:05-cv-00217-LAS Document 15 Filed 04/10/2006 Page 47 of 47

It was also confirmed that the only forwarding and reception channel will be our Association.

Regarding code No. 17, it was cleared out that it will be valid only in its first part..

They considered important to mention that they negotiated that the US Postal Service returns the original Money Orders whenever necessary. For that purpose Mr. Parrot will send the corresponding application form.

Following the above a brief session of questions and answers was held, in order to clear out doubts.

Miss Jayne Schwarz indicated that they would start with the reimbursable Money Orders for 1997.

Upon conclusion, Lic. Schabes asked the CEOs if they would be interested and willing to purchase the US Money Orders again.

In answer to Mr. Schabes' question Lic. Héctor Lagos stated that, considering the outcome of the negotiations held and their present status, our Sector should be willing to reinitiate purchasing these instruments again immediately. After discussion, all the CEOs confirmed their willingness to buy Money Orders again, provided that there should exist an instrument that makes official all the agreements reached. Therefore, upon execution of such a document they will reinitiate the purchase of Postal Money Orders.

The attendants expressed their appreciation for the presence and good will showed by Mr. James Parrot, Associate Counsel Officer of the Chief Inspector, as well as by Miss Jayne Schwarz, Mgr. Corporate Accounting Finance, throughout the negotiation period. We expect to receive from the USPS, a document containing all the above agreements.