**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ARBITRAJE CASA DE CAMBIO, S.A. DE CV; ASESORIA CAMBIARIA, CASA DE CAMBIO, S.A. DE C.V.; C.B.I. CASA DE CAMBIO, S.A. DE CV.; CASA DE CAMBIO DINEX, S.A. DE C.V.; INTERCAM CASA DE CAMBIO, SA. DE CV.; CASA DE CAMBIO MONEX, S.A. DE C.V.; CASA DE CAMBIO PUEBLA, S.A. DE C.V.; S.C. DIVISAS CASA DE CAMBIO, S.A. DE C.V.; CASA DE CAMBIO TAMIBE, S.A. DE CV.; and CASA DE CAMBIO TIBER, S.A. DE C.V. | ) | Case No. 05-217C<br>Senior Judge Smith |
| Plaintiffs, | ) | |
| vs. | ) | |
| UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**

**MOTION TO DISMISS**

Howard G. Slavit
DC Bar No. 962886
SAUL EWING LLP
2600 Virginia Avenue, N.W.
Suite 1000 – The Watergate
Washington, DC 20037-1922
(202) 333-8800 (tel.)
(202) 337-6065 (fax)

Mark C. Cawley
DC Bar No. 468611
SAUL EWING LLP
3800 Centre Square West
1500 Market St.
Philadelphia, PA 19102
(215) 972-1887 (tel.)
(215) 972-2298 (fax)

Counsel for the Plaintiffs

# TABLE OF CONTENTS


Page

I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 3

A. HOW POSTAL SERVICE INTERNATIONAL MONEY ORDERS WORK ........ 3

B. MEXICO'S ECONOMIC CRISIS AND THE FLOOD OF FRAUDULENT MONEY ORDERS ........ 4

C. NEGOTIATIONS BETWEEN THE POSTAL SERVICE AND THE EXCHANGE HOUSES ........ 5

III. STANDARD OF REVIEW ........ 7

IV. ARGUMENT ........ 8

A. THIS COURT HAS JURISDICTION OVER THE EXCHANGE HOUSES' LAWSUIT ........ 8

1. The Exchange Houses Have Either Met The CDA's Jurisdictional Requirements Or The CDA Does Not Apply To This Contract And This Court Should Transfer This Case Back To The U.S. District Court For The District Of Columbia ........ 8

2. The Exchange Houses Have Satisfied The CDA's Jurisdictional Requirements ........ 9

3. Alternatively, The CDA Does Not Apply Here And This Court Should Send This Case Back To The District Court ........ 11

B. THE POSTAL SERVICE WAS NOT ACTING IN A SOVEREIGN CAPACITY WHEN IT ENTERED INTO A COLLABORATIVE, COMMERCIAL CONTRACT WITH THE EXCHANGE HOUSES ........ 14

C. THE EXCHANGE HOUSES HAVE ADEQUATELY PLED THE EXISTENCE OF A CONTRACT.... 18

V. CONCLUSION ........ 23

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Adams v. United States*, 391 F.3d 1212 (Fed. Cir. 2004) ....................................................8

*Advanced Team Concepts, Inc. v. United States*, 68 Fed. Cl. 147 (2005) .........................21

*Am. Fed. Bank v. United States*, 62 Fed. Cl. 185 (2004) ..................................................19

*Arbitraje Casa de Cambio, S.A. de C.V. et al. v. U. S. Postal Service*, 297 F. Supp. 2d 165 (D.D.C. 2003) ..........................................................................................3

*Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Service*, No. CIV. A. 02-0777 (RMC), 2004 WL 3257073, *2-3 (D.D.C. Nov. 30, 2004) .................................9

*Bailey v. United States*, 46 Fed. Cl. 187 (2000)..........................................................8, 12

*Bolognesi v. United States*, 189 F. 335 (2d Cir. 1911) ......................................................17

*Brunner v. United States*, 70 Fed. Cl. 623 (2006)............................................................21

*Buesing v. United States*, 42 Fed. Cl. 679 (1999) ......................................................7, 20

*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800 (1988)...........................11, 14

*Coastal Corp. v. United States*, 713 F.2d 728 (Fed. Cir. 1983)..........................................8

*Cooke v. United States*, 91 U.S. 396 (1875) ......................................................................15

*Currency Servs. v. Matthews*, 90 F. Supp. 40 (W.D. Wis. 1950) .....................................17

*G.E. Boggs & Assocs., Inc. v. Roskens*, 969 F.2d 1023 (Fed. Cir. 1992) ......................8, 11

*Goldstick v. ICM Realty*, 788 F.2d 456 (7th Cir. 1986)....................................................21

*Institut Pasteur v. United States*, 814 F.2d 624 (Fed. Cir. 1987).................................8, 12

*Kania v. United States*, 650 F.2d 264 (Ct. Cl. 1981) ..................................................14, 16

*LaSalle Talman Bank v. United States*, 64 Fed. Cl. 90 (2005), *aff'd*, 462 F.3d 1331 (Fed. Cir. 2005)..................................................................................................11

*Lambert v. Blackwell*, 387 F.3d 210 (3d Cir. 2004), *cert. denied*, 544 U.S. 1063 (2005)..................................................................................................................11

*OAO Corp. v. United States*, 17 Cl. Ct. 91, 103 (1989)....................................................19

*Roberta B. v. Tenet*, 71 Fed. App'x 45, 47-48 (Fed. Cir. 2003)..........................................8

*Stewart v. United States*, 300 F. Supp. 1047 (E.D. Mich. 1969) ......................................17

*Stovall v. United States*, 71 Fed. Cl. 696 (2006)..................................................14, 15, 17

*Tewani Imports, Inc. v. Norwest Bank, N.A.*, 139 F. Supp. 2d 805 (S.D. Tex. 2001) ...............................................................................................................4

*Texas Instruments, Inc. v. United States*, 922 F.2d 810 (Fed. Cir. 1990)..........................20

*Total Med. Mgmt. v. United States*, 104 F.3d 1314 (Fed. Cir. 1997) ..........................18, 21

*United States v. Northwestern National Bank & Trust Co. of Minneapolis*, 35 F. Supp. 484 (D. Minn. 1940) .........................................................................................17

*Wesleyan Co. v. Harvey*, 454 F.3d 1375 (Fed. Cir. 2006).................................................11

*Woll v. United States*, 45 Fed. Cl. 475 (1999), *aff'd* 251 F.3d 171 (Fed. Cir. 2000) ...........8

**FEDERAL STATUTES**

41 U.S.C. § 601(3) ...............................................................................................................9

41 U.S.C. § 602(a) ........................................................................................................8, 11

41 U.S.C. § 609(a) ...............................................................................................................9

## I. INTRODUCTION

Consumers buy money orders from the United States Postal Service as a means to send money cheaply and safely through the mail. Postal money orders, however, are only useful to consumers if third parties are willing to convert them into cash by purchasing them from the intended recipient. Put differently, if Postal Service money orders are not accepted by third parties like banks and exchange houses, consumers will use other money-transfer providers whose products are more readily accepted in the market. As a competitor in the money-transfer market, the Postal Service therefore has an incentive to collaborate on a commercial level with banks and exchange houses to ensure a robust third-party market for its product.

The Postal Service, a legal entity distinct from the United States, entered into just such a collaborative agreement with these Mexican "Casas de Cambio" plaintiffs (hereinafter, "the Exchange Houses"). After suffering massive losses due to rampant fraud related to U.S. money orders, the Mexican Exchange Houses ceased cashing any U.S. money orders. Recognizing that this threatened the commercial viability in Mexico of its international money orders, the Postal Service negotiated and reached an agreement with the Exchange Houses in which it agreed to take steps to protect them from further fraud and to refund monies it "reclaimed" from the Exchange Houses. In return, the Exchange Houses agreed to resume cashing U.S. money orders. The Postal Service, however, never took any of its promised steps—thereby causing the Exchange Houses to incur millions of dollars in damages. This breach-of-contract suit is the Exchange Houses' effort to call the Postal Service to account.

In an effort to deflect attention away from the merits of this case, the Postal Service first argues that this Court has no jurisdiction to hear this case. That argument consists of two equally implausible claims.

First, the Postal Service contends that the collaborative contract between it and the Exchange Houses is subject to the Contract Disputes Act ("CDA") and that this Court lacks jurisdiction because the Exchange Houses never formally presented their claims to a Contracting Officer. The Postal Service thus asks this Court to (1) apply a procurement statute to a collaborative contract that never contemplated procurement of anything *and* (2) to throw the Exchange Houses out of court for not first presenting their claims to a Contracting Officer when—by its very nature—no Contracting Officer was required for the collaborative contract at issue. This Court should reject the invitation to hold the Exchange Houses to an impossible standard. Instead, the Court should either (1) conclude that the Exchange Houses have effectively satisfied the CDA's jurisdictional provisions or (2) transfer this case back to the District Court—holding that the District Court erroneously concluded that the CDA applies to this contract in the first place.

Second, the Postal Service contends that this Court has no jurisdiction because it was acting in its sovereign capacity when it entered into its collaborative, commercial contract with the Exchange Houses. Sovereign immunity, however, applies only to a narrow set of uniquely governmental functions that have no private-party analogue, such as plea agreements. Sovereign immunity does not cloak the Government in immunity when, as here, it "steps off the throne" and acts like any other market participant. The contract at issue here was a collaborative, commercial agreement that could have been entered into by any private provider of money-transfer services. Accordingly, nothing about this agreement is entitled to sovereign immunity.

Finally, in arguing that the Amended Complaint fails to plead an enforceable contract, the Postal Service ignores the contract pleaded in the Amended Complaint and, further, turns the

standard of review on its head by urging this Court to resolve factual disputes in its favor. For all these reasons, this Court should deny the motion to dismiss.

## II. STATEMENT OF FACTS

### A. How Postal Service International Money Orders Work

For a fee, the Postal Service issues both domestic and international money orders. *See* Amended Complaint ("Am. Compl.") ¶ 22. A large number of these money orders are used by Mexican immigrants as a safe and reliable means of sending money to relatives in Mexico. *See id.* ¶ 45. These international money orders compete with privately issued money orders, cashier's checks, teller's checks, and electronic money-transfer systems in the market for money-transfer services. *See id.* ¶ 26.

As part of their regular business operations, the Exchange Houses purchase U.S. postal money orders in Mexico for a fee from payees residing in Mexico, who endorse the money orders over to the Exchange Houses. *See id.* ¶ 46. After purchasing money orders, the Exchange Houses forward the money orders to their U.S. correspondent banks that, in turn, present the money orders to various Federal Reserve Banks for credit. *See id.* ¶ 47. After the correspondent banks present the money orders to a Federal Reserve Bank, they credit the Exchange Houses' accounts for the value of the money orders. *See id.* The Federal Reserve Banks draw against the Postal Service's account at the United States Treasury for the value of the money orders presented and credit the accounts of the correspondent banks in that amount. *See id.*; *see also Arbitraje Casa de Cambio, S.A. de C.V. et al. v. U. S. Postal Service*, 297 F. Supp. 2d 165, 167 (D.D.C. 2003) (describing how U.S. Postal Service money orders work their way through the Federal Reserve system).

The Postal Service has the right to inspect the money orders and, if it finds fraud, the right to "reclaim" the money drawn from its Treasury account. In that case, the process reverses

itself. The Federal Reserve debits the account of the correspondent banks which, in turn, debit the accounts of the Exchange Houses that initially purchased the money orders. *See, e.g., Tewani Imports, Inc. v. Norwest Bank, N.A.*, 139 F. Supp. 2d 805, 808-09 (S.D. Tex. 2001).

**B. Mexico's Economic Crisis And The Flood Of Fraudulent Money Orders**

Beginning in 1995, Mexico suffered a severe economic crisis triggered by a sharp devaluation of the Peso and a rapid decline in foreign investment. *See* Am. Compl. ¶ 48. This crisis prompted a surge in U.S. money-order fraud. Purchasers of international money orders inundated the Postal Service with refund demands, claiming that the alleged payees of the money orders either never received the orders or that the money orders were cashed by criminals who forged the payees' signatures. *See id.* ¶ 49.

When the beneficiary of a U.S. Postal Service money order notifies the purchaser of the money order that it has been stolen, the purchaser can demand a refund from the Postal Service by requesting what is known as a 6401 Review. *See id.* ¶ 35. According to its own regulations, the Postal Service then must conduct an investigation, including an examination of the money order at issue to determine whether the endorsement is a forgery. *See id.* ¶ 36. Once the Postal Service completes that review, the purchaser and the payee must complete a "Form 306," which serves as an affidavit attesting to the theft or forgery. *See id.* ¶¶ 36-37. Based on the results of the Postal Service's investigation, it may refund the money to the purchaser and "reclaim" that money from the presenting bank.

As a result of the flood of refund demands, the Postal Service began reclaiming millions of dollars from the Exchange Houses' correspondent banks, which in turn debited the Exchange Houses' accounts. *See id.* ¶¶ 52, 58, 62. Between the third quarter of 1996 and November 1997, the Exchange Houses' losses exceeded $8.9 million. *See id.* ¶ 60. As their losses mounted, the Exchange Houses learned that the Postal Service had relied on Form 306 affidavits that

contained obvious, flagrant irregularities or affidavits that were incomplete or contained incriminating information. *See id.* ¶ 51. In an effort to stanch their massive losses, the Exchange Houses began refusing to purchase Postal Service money orders. *See id.* ¶ 60.

**C. Negotiations Between The Postal Service And The Exchange Houses**

Representatives from the Exchange Houses and the Postal Service met in Mexico City in November 1997 to address the grievances that led the Exchange Houses to cease purchasing Postal Service money orders. *See id.* ¶ 65. The matters addressed at that meeting included: (1) the Postal Service's lack of thoroughness in accepting and processing refund affidavits regardless of the validity of such affidavits; (2) the failure of the Postal Service and/or its agents to return the original money order documents to the Exchange Houses, which prevented the Exchange Houses from—among other things—initiating legal action in Mexico against the Mexican parties who had deposited the forged or stolen money orders; and (3) the Postal Service's lack of a clearly expressed and publicized procedure for submitting requests for clarification or further investigation of the reclamations. *See id.* ¶ 67.

The negotiations continued at a December 10, 1997 meeting in Washington, D.C. at which Jayne Schwarz, the Postal Service's Manager of Corporate Accounting, and others represented the Postal Service. *See id.* ¶ 70; Letter from J. Schwarz to m. Abreau & J. Schabes (Dec. 23, 1997) (Exhibit A). During that meeting, the Postal Service offered to take a variety of actions in return for the Exchange Houses' promise to resume purchasing money orders. *See id.* ¶¶ 69, 75. Specifically, the Postal Service offered to:

- provide a grace period lasting until March 31, 1998 during which the Postal Service would not automatically debit the accounts of the Exchange Houses' correspondent banks;
- study whether to shorten (1) the period during which a purchaser could demand a refund and (2) the expiration date on money orders;

- reexamine the refund demands that served as the basis of the reclamations in light of a list of 48 anomalies in those demands to determine whether the reclamations should be reversed;
- return original affidavits and money orders to the Exchange Houses so that they could use them to initiate suit in Mexico;
- establish a written procedure whereby, prior to reclamation, the Exchange Houses could review refund affidavits and purportedly forged endorsements; and
- organize a working group to study other reforms of the U.S. international money order system, including the establishment of a requirement that both the purchaser and payee of a money order submit notarized signatures as part of their refund demand affidavit.

*See id.* In return for these promises, Jayne Schwarz urged the Exchange Houses to "start the process of accepting Postal Money Orders with the assurance that we are working as diligently as possible to streamline the process and make it as workable as possible." *See id.* ¶ 75; Letter from J. Schwarz to M. Abreu & J. Schabes (Dec. 23, 1997) (Exhibit A). Schwarz further confirmed the Postal Service's agreement with the Exchange Houses in a January 14, 1998 letter. In that letter, Schwarz outlined the Postal Service's promises and stated that these promises were offered in return for the Exchange Houses' "determination that U.S. International Postal Money Orders will be cashed shortly." *See* Am. Compl. ¶ 76; Letter from J. Schwarz & J. Parrott to M. Abreu & J. Schabes (Jan. 14, 1998) (Exhibit B).

Representatives from the Postal Service and the Exchange Houses met again at a January 21, 1998 meeting to discuss the details of implementing the Postal Service's promised courses of action. *See* Am. Compl. ¶ 71. Among other details discussed, the parties confirmed the list of anomalies that would provide a basis for reimbursing the Exchange Houses for reclamations already made. *See id.*

The parties held another meeting in February 1998 to further clarify how the Postal Service would abide by the promises it made at the December 10, 1997 meeting. *See id.* ¶ 73. At the February 1998 meeting, having been repeatedly assured by the Postal Service that it

intended to make good on the promises it made at the December 10, 1997 meeting, the Exchange Houses agreed to begin cashing Postal Service money orders. *See id.* ¶ 79. The Postal Service further confirmed the agreement reached at the December 10, 1997 meeting in a November 7, 1998 letter from Linda Kudelka, its head of General Accounting. *See id.* ¶ 82. Therein, she summarized the Postal Service's agreement with the Exchange Houses stating that, "[t]he US Postal Service has an agreement with the Mexican Casas . . . ." *See id.* ¶ 82.

After convincing the Exchanges House to resume cashing Postal Service money orders, the Postal Service never took any of its promised actions. *See id.* ¶¶ 83, 95-100. As a result of the Postal Service's breaches, the Exchange Houses incurred millions of dollars in losses on fraudulent money orders reclaimed by the Postal Service. *See id.* ¶ 102. In addition, the Postal Service's failure to return original fraudulent money orders and accompanying refund demands caused the Exchange Houses to lose the ability to prosecute the depositors of the fraudulent money orders in Mexico. *See id.* ¶ 103. Further, the massive financial losses resulting from the Postal Service's reclamations harmed the Exchange Houses' reputations in the Mexican financial community. *See id.* ¶ 103. The Exchange Houses sent numerous letters and email messages to Jayne Schwarz and others protesting the Postal Service's failure to abide by its promises. *See id.* ¶¶ 84, 85, 88. In a letter dated September 24, 1999, Schwarz rejected those claims and notified the Exchange Houses' representatives that the Postal Service was terminating what Schwarz referred to as a "Pilot Program" with the Exchange Houses. *See id.* ¶ 87; Letter from Jayne Schwarz (Sept. 24, 1999) (Exhibit C).

## III. STANDARD OF REVIEW

The standard governing a motion to dismiss is well known. The court should not grant a motion to dismiss unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Buesing v. United States*, 42 Fed. Cl.

679, 685 (1999) (citation omitted). When evaluating a motion to dismiss, the Court "must assume that all well-pled factual allegations in the complaint are true and draw all reasonable inferences in favor of the non-movant." *Adams v. United States*, 391 F.3d 1212, 1218 (Fed. Cir. 2004).

## IV. ARGUMENT

### A. This Court Has Jurisdiction Over The Exchange Houses' Lawsuit

This Court has jurisdiction over the Exchange Houses' breach of contract claim. The Postal Service's claims notwithstanding, neither the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601-613, nor notions of sovereignty divest this Court of jurisdiction over this case.

#### 1. The Exchange Houses Have Either Met The CDA's Jurisdictional Requirements Or The CDA Does Not Apply To This Contract And This Court Should Transfer This Case Back To The U.S. District Court For The District Of Columbia

In the District Court, the Postal Service argued strenuously—and the District Court ruled—that the CDA applied to the collaborative contract at issue here, even though:

- the CDA, on its face, applies only to the government's procurement of goods and services for the government's direct benefit (*see* 41 U.S.C. § 602(a));
- numerous decisions from courts in this Circuit—which have a particular expertise in construing procurement legislation—have held that the CDA does not govern collaborative contracts with the Government and that the CDA's scope is limited to traditional procurement contracts implicating competitive bidding and a buyer/seller relationship;[1]
- the collaborative contract at issue here involved neither the procurement of goods nor services for the Postal Service's direct benefit;

[1] *See, e.g.*, *Roberta B. v. Tenet*, 71 Fed. App'x 45, 47-48 (Fed. Cir. 2003) (holding that CIA employee's relocation contract was not a contract for procurement of services and therefore not covered by the CDA); *G.E. Boggs & Assocs., Inc. v. Roskens*, 969 F.2d 1023, 1026 (Fed. Cir. 1992) ("[n]ot all governmental contracts . . . fall within the Contract Disputes Act"); *Institut Pasteur v. United States*, 814 F.2d 624 (Fed. Cir. 1987) (holding that CDA did not apply to collaborative contract involving AIDS research); *Coastal Corp. v. United States*, 713 F.2d 728, 730 (Fed. Cir. 1983) ("The scope of the Act thus is limited to express or implied contracts for the *procurement* of services and property and for the disposal of personal property.") (emphasis added); *Bailey v. United States*, 46 Fed. Cl. 187 (2000) (finding that collaborative contract with attorney to repatriate his client's assets was not a procurement contract and therefore not subject to the CDA); *Woll v. United States*, 45 Fed. Cl. 475, 480 (1999) (collaborative testing contract did not come within purview of CDA), *aff'd*, 251 F.3d 171 (Fed. Cir. 2000).

- the contract did not create a buyer/seller relationship between the Exchange Houses and the Postal Service; and
- the creation of this contract involved neither competitive bidding, the involvement of a contracting officer, or any of the other indicia of federal procurement.

*See Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Service*, No. CIV. A. 02-0777 (RMC), 2004 WL 3257073, *2-3 (D.D.C. Nov. 30, 2004).

Now, after convincing the District Court to apply a procurement statute to a contract that manifestly did not involve procurement—much less a Contracting Officer—*and* after convincing the District Court to transfer this case to this Court, the Postal Service now argues that this Court should dismiss this case because the Exchange Houses did not first present their claims to a Contracting Officer. This Court should reject the Postal Service's efforts to hold the Exchange Houses to this impossible standard and to deny them their long-awaited "day in court." Instead, this Court should hold either that—based on the facts pled—the Exchange Houses effectively satisfied the CDA's jurisdictional prerequisites or that the CDA does not apply to this collaborative contract and transfer this case back to the District Court for the District of Columbia.

### 2. The Exchange Houses Have Satisfied The CDA's Jurisdictional Requirements

The CDA requires a contractor to submit its claim to a Contracting Officer for a final decision before pursuing relief in federal court. *See* 41 U.S.C. § 609(a). The CDA defines the term "Contracting Officer" to mean "any person who, by appointment in accordance with applicable regulations, has the authority to enter into and administer contracts and make determinations and findings with respect thereto." *See* 41 U.S.C. § 601(3). Here, there was no official Contracting Officer assigned to the negotiations with the Exchange Houses because the Postal Service was pursuing a collaborative agreement, not a procurement contract. Regardless,

the Postal Service's Jayne Schwarz was the functional equivalent of a Contracting Officer, and she issued a final decision on the Exchange Houses' contract claims.

As the Amended Complaint makes clear, Schwarz was the Postal Service's point-person in the negotiations with the Exchange Houses. *See* Am. Compl. ¶¶ 70, 74, 87. She not only participated in the key December 10, 1997 meeting at which the parties negotiated, and settled on, the terms of the contract, but she also signed the December 23, 1997 letter confirming the terms of the agreement. *See id.* ¶ 69; Letter from J. Schwarz to M. Abreau & J. Schabes (Dec. 23, 1997) (Exhibit A). Schwarz further confirmed the Postal Service's agreement with the Exchange Houses in a January 14, 1998 letter. *See id.* ¶ 76. In that letter, Schwarz outlined the Postal Service's promises and stated that these promises were offered in return for the Exchange Houses' "determination that U.S. International Postal Money Orders will be cashed shortly." *See id.*; Letter from J. Schwarz & J. Parrott to M. Abreu & J. Schabes (Jan. 14, 1998) (Exhibit B). Schwarz also attended meetings with the Exchange Houses in February 1998. Significantly, the parties acknowledged that "any and all proposals in this entire effort will require concurrence from Jayne Schwarz." *See* Exhibit C to Government's Motion to Dismiss ("Gov't Mot. Dismiss").

When the Postal Service refused to keep the promises it made in December 1997, the Exchange Houses inundated the Postal Service with numerous emails and other correspondence protesting its breach of contract. *See* Am. Compl. ¶ 88. Schwarz was copied on most of that correspondence. *See id.* Finally, on September 24, 1999, Schwarz rendered a final decision regarding the Exchange Houses' claims when she sent a letter stating that the USPS was terminating its agreement with the Exchange Houses. *See* Letter from Jayne Schwarz (Sept. 24, 1999) (Exhibit C). Thus, at this stage of the proceedings, the Exchange Houses are entitled to

the inferences that Jayne Schwarz was the functional equivalent of a Contracting Officer, that the Exchange Houses presented their contract claims to her, and that she issued a final decision denying them.

**3. Alternatively, The CDA Does Not Apply Here And This Court Should Send This Case Back To The District Court**

Alternatively, the Court should transfer this case back to the District Court on the ground that the CDA does not apply to the collaborative contract at issue here. A transferee court "has the power to revisit prior decisions of its own or of a coordinate court" where "the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (citation omitted); *see also Lambert v. Blackwell*, 387 F.3d 210, 237 (3d Cir. 2004), *cert. denied*, 544 U.S. 1063 (2005); *LaSalle Talman Bank v. United States*, 64 Fed. Cl. 90, 96-97 (2005), *aff'd*, 462 F.3d 1331 (Fed. Cir. 2005).

By its plain terms, the Act applies only to:

> Any express or implied contract . . . entered into by an executive agency for
>
> (1) the procurement of property, other than real property in being;
>
> (2) the procurement of services;
>
> (3) the procurement of construction, alteration, repair or maintenance of real property; or,
>
> (4) the disposal of personal property.

41 U.S.C. § 602(a). The Federal Circuit has construed "procurement" to mean "the acquisition by purchase, lease or barter, of property or services for the *direct benefit or use* of the Federal Government," *Wesleyan Co. v. Harvey*, 454 F.3d 1375, 1378 (Fed. Cir. 2006), and has emphasized that the CDA applies only in the context of a buyer-seller relationship. *See, e.g.*, *Roskens*, 969 F.2d at 1027 (noting that the regulations associated with the CDA "emphasize the buyer-seller relationship").

The Federal Circuit and this Court have consistently held that the CDA does not govern collaborative contracts that do not involve the procurement of any tangible property or services for an executive agency's direct benefit. *See supra* note 1. For example, in *Institut Pasteur v. United States*, 814 F.2d 624 (Fed. Cir. 1987), the plaintiff collaborated with scientists at the National Cancer Institute ("NCI") in conducting AIDS research. *See id.* at 625. As part of that collaboration, the plaintiff sent samples of a virus to NCI scientists along with a nondisclosure agreement that was ultimately signed by a scientist at the Cancer Institute. *See id.* at 625-26. When the NCI scientists applied for a patent for an AIDS diagnostic kit that used the plaintiff's virus, the plaintiff sued for breach of contract. On the Government's motion to dismiss, the Claims Court held that the alleged contract was governed by the CDA and that it lacked jurisdiction under the CDA because the plaintiff had failed to present a certified claim to an agency contracting officer. *See id.* at 626. On appeal, the Federal Circuit reversed, holding that the CDA did not apply to the collaborative contract at issue because the Government did not procure anything and there was no buyer-seller relationship between the parties. *See id.* at 627-28.

Likewise, in *Bailey v. United States*, 46 Fed. Cl. 187 (2000), this Court held that the CDA did not apply to "a collaborative effort between the government and Mr. Bailey . . . to repatriate overseas property" belonging to Bailey's client. *Id.* at 211. This Court explained that the alleged agreement with Bailey bore none of the hallmarks of traditional government procurement contracts, such as competitive bidding and the purchase of goods or services. *See id.* at 210-12.

Those decisions apply squarely here. In contracting with the Exchange Houses, the Postal Service did not procure any property or services, and the contract does not remotely implicate a buyer-seller relationship. Instead, the Postal Service entered into a collaborative,

commercial contract with the Exchange Houses with the two-fold purpose of (1) resolving the Houses' disputes regarding the reclamation of millions of dollars in fraudulent money orders and (2) reopening the Mexican market to Postal Service money orders for the benefit of Postal Service customers and their Mexican relatives. This contract thus bears all the hallmarks of other collaborative contracts that the Federal Circuit has found to fall outside of the CDA's scope.

The Postal Service argues that it procured "services" from the Exchange Houses and that the contract therefore falls under the CDA. Gov't Mot. Dismiss 14. That argument, however, fundamentally misconstrues the Exchange Houses' role in the money-order system. The Exchange Houses cash money orders on behalf of third parties: namely, the payees of money orders purchased in the United States. The Postal Service is not directly involved in transactions between those payees and the Exchange Houses. The Exchange Houses' agreement to resume cashing money orders thus does not directly benefit the Postal Service at all.

Moreover, the Postal Service itself has confirmed that it negotiated with the Exchange Houses—not because the Postal Service wanted to procure anything for its own direct benefit—but, instead, for the benefit of its current and future customers. The Postal Service's own Jayne Schwarz and James Parrott neatly summarized the Postal Service's intentions in contracting with the Exchange Houses when they claimed that it was the Postal Service's "intention to work with the Banks and Casas of Mexico *in order to benefit our money order customers, both the purchaser and payee.*" Letter from J. Schwarz & J. Parrott to M. Abreau & J. Schabes (Jan. 14, 1998) (emphasis added) (Exhibit B). Thus, it is those customers—and not the Postal Service itself—that directly benefited from the Exchange Houses' agreement to resume cashing Postal Service money orders.

Accordingly, the Exchange Houses provided no services to the Postal Service that would subject the contract at issue here to the CDA's jurisdictional provisions. Since the District Court's transfer ruling was both "clearly erroneous and would work a manifest injustice," *Christianson*, 486 U.S. at 817, the Exchange Houses respectfully request that this Court re-transfer this case to the District Court for the District of Columbia.

**B. The Postal Service Was Not Acting In A Sovereign Capacity When It Entered Into A Collaborative, Commercial Contract With The Exchange Houses**

When the Postal Service entered into this collaborative, commercial contract with the Exchange Houses, it was acting in a proprietary—rather than sovereign—capacity and, thus, subjected itself to money damages for breach of that contract. The Postal Service argues that it contracted with the Exchange Houses in its sovereign capacity and, therefore, that this case must be dismissed because the contract was not made by someone with authority to bind the Postal Service and did not clearly provide for money damages. Gov't Mot. Dismiss. 14-18. The Postal Service's theory is without merit.

An agreement with the Government enjoys the protections of sovereign-capacity doctrine where it is the sort of agreement "that can *only* be executed by the sovereign." *Stovall v. United States*, 71 Fed. Cl. 696, 698 (2006) (emphasis in original). In that case, the alleged contract must be made by someone with authority to bind the United States to pay money damages and the contract must provide for the payment of such damages in the event of a breach. *See Kania v. United States*, 650 F.2d 264, 268 (Ct. Cl. 1981). The doctrine is "necessarily narrow in scope and, importantly, does not include every action taken by the government in its "sovereign capacity." *Stovall*, 71 Fed. Cl. at 699. "Correspondingly, the concept of what falls within the 'proprietary' realm . . . is relatively broad and includes not only the 'principal class of contract' involving the procurement of goods, lands, and services, but any other agreement undertaken by

the Federal government that has a private analogue, that is, categorically of the sort that can be executed among private entities and individuals." *Id.* Put differently, if Government "comes down from its position of sovereignty, and enters the domain of commerce, it subjects itself to the same laws that govern individuals there." *Cooke v. United States*, 91 U.S. 396, 398 (1875).

In *Stovall*, this Court found that the United States was not shielded from liability under the sovereign-capacity doctrine because the agreement it reached with Stovall was made in its proprietary capacity. *See Stovall*, 71 Fed. Cl. at 697. Stovall had filed a complaint with the United States Department of Agriculture ("USDA") charging the Farm Services Agency ("FSA") with racial discrimination. *Id.* The USDA found that the FSA discriminatorily denied Stovall farm ownership and operating loans. *Id.* As a result, the USDA executed a "Resolution Agreement" with Stovall, under which he waived any rights against USDA and its employees arising from his complaint in exchange for the USDA's promises to pay him $145,000 in compensatory damages and other consideration. *Id.* Stovall later brought suit against the Government, alleging that it breached the "Resolution Agreement." The Government argued that the sovereign-capacity doctrine immunized it from suit, but this Court rejected that claim finding that Stovall's suit involved "the settlement of a discrimination claim, a type of agreement that arises frequently in the private sector." *Id.* at 701.

Here, the agreement between the Exchange Houses and the Postal Service is like the Resolution Agreement at issue in *Stovall* because it is manifestly one that could have been executed among private entities. Distilled to its essence, the agreement here is a collaborative, commercial contract intended to settle the Exchange Houses' disputes in return for the Exchange Houses' agreement to resume purchasing the Postal Service's product—money orders—for the benefit of the Postal Service's customers. Any bank or other private issuer of money orders,

such as Western Union, could have agreed to substantially the same terms. Like the Postal Service here, a private provider of money-transfer services could also promise the Exchange Houses that it would take steps to: (1) provide a grace-period before demanding repayment from the Exchange Houses; (2) study whether to shorten the period during which a purchaser could demand a refund, (3) analyze whether it could shorten the expiration date on its money-order equivalents; (4) examine its internal procedures for analyzing fraud claims; (5) return original fraud affidavits and money-order equivalents to the Exchange Houses; and (6) organize a working group to study other reforms. Thus, there is nothing uniquely sovereign about the collaborative contract at issue here.

None of the cases the Postal Service cites in its Motion to Dismiss compels a different conclusion. It relies chiefly on *Kania*, in which the plaintiff sued the Government for breaching an agreement not to prosecute him. *See* Gov't Mot. Dismiss 14. The Court in *Kania* held that it lacked jurisdiction because such agreements fall squarely within the Government's sovereign functions and the agreement in question did not provide for money damages. *See Kania*, 650 F.2d at 267-268. The agreement at issue here, however, bears no resemblance to the one in *Kania*, which has no private analogue and which could *only* be entered into with the Government. To the contrary, the contract here is collaborative and commercial in nature and designed to ensure a market for the Postal Service's money orders. Any two private entities could have entered into a similar agreement.

Nor does it follow, as the Postal Service suggests (Gov't Mot. Dismiss 15-17), that any and all agreements remotely connected to the issuance of money orders are protected by the sovereign-capacity doctrine. Under the Postal Service's logic, all manner of parties would face substantial jurisdictional hurdles in disputes with the Postal Service, including contractors who

print U.S. money orders, software designers who write programs to electronically track money orders issued by the Postal Service, and others. The Postal Service cites no authority justifying such an extreme expansion of the sovereign-capacity doctrine. Nor is there any. Indeed, this Court has held that a similarly "broad formulation of what is 'sovereign' would sweep in every authorized action taken by the government . . . ." *Stovall*, 71 Fed. Cl. at 699 n.4.

Nor is it the least bit relevant that money orders are not negotiable instruments. *See* Gov't Mot. Dismiss 15-16. The Exchange Houses do not allege that they are entitled to recovery because they were holders in due course of fraudulent money orders. Thus, the Postal Service errs in relying on *Bolognesi v. United States*, 189 F. 335 (2d Cir. 1911) and *United States v. Northwestern National Bank & Trust Co. of Minneapolis*, 35 F. Supp. 484 (D. Minn. 1940). In both cases, the courts held that, because money orders were not negotiable instruments, the United States could recover money from banks that mistakenly cashed fraudulent money orders.

*Stewart v. United States*, 300 F. Supp. 1047 (E.D. Mich. 1969) and *Currency Servs. v. Matthews*, 90 F. Supp. 40 (W.D. Wis. 1950), likewise have no bearing here. *See* Gov't Mot. Dismiss 16. In *Stewart*, the District Court held that Stewart could not recover the value of stolen money orders from the United States—a holding which the District Court premised entirely on agency principles. *See Stewart*, 300 F. Supp. at 1050 ("Both of the parties have stipulated . . . that the instant case can be completely resolved with sole reference to the general principle of the law of agency."). And *Matthews* addressed the question whether a state legislature could regulate the sale of money orders. *See Matthews*, 90 F. Supp. at 43. That case obviously has no application here.

Thus, the Postal Service advances no convincing grounds for applying the sovereign-capacity doctrine here. Accordingly, the heightened-pleading standards associated with sovereign contracts do not apply.

### C. The Exchange Houses Have Adequately Pled The Existence Of A Contract

To state a claim for breach of contract against the Postal Service, the Amended Complaint must plead "a mutual intent to contract including offer, acceptance, consideration, and authority on the part of the government representative who entered into or ratified the agreement to bind the United States." *Total Med. Mgmt. v. United States*, 104 F.3d 1314, 1319 (Fed. Cir. 1997). The Exchange Houses' Amended Complaint satisfies these standards.

As an initial matter, the Amended Complaint sets forth in detail the Postal Service's offer. Specifically, at the December 10, 1997 meeting in Washington, D.C., the Postal Service offered to undertake a series of actions in return for the Exchange Houses' commitment to resume purchasing U.S. international money orders. Those actions included

- providing a grace period during which the Postal Service would not automatically debit the accounts of the Exchange Houses' correspondent banks;
- studying whether to shorten (1) the period during which a purchaser could demand a refund and (2) the expiration date on money orders;
- reexamining the refund demands that served as the basis of the reclamations in light of a list of 48 anomalies in those demands to determine whether the reclamations should be reversed;
- returning original affidavits and money orders to the Exchange Houses so that they could use them to initiate suit in Mexico;
- establishing a written procedure whereby, prior to reclamation, the Exchange Houses could review refund affidavits and purportedly forged endorsements; and
- organizing a working group to study other reforms of the U.S. international money order system, including the establishment of a requirement that both the purchaser and payee of a money order submit notarized signatures as part of their refund demand affidavit.

*See* Am. Compl. ¶ 69. Although the details of these promises were to be worked out in subsequent meetings, the elements of the offer were clear at the December 10, 1997 meeting.

Indeed, Jayne Schwarz noted in her December 23, 1997 letter to the Exchange Houses' representatives that continued dialogue was important "to facilitate the *duties* we have outlined for ourselves." *See* Letter from J. Schwarz to M. Abreu & J. Schabes (Dec. 23, 1997) (emphasis added) (Exhibit A).

The Exchange Houses accepted that offer at the February 1998 meeting when they agreed to resume cashing U.S. money orders. *See* Am. Compl. ¶ 79. Assuming the risk of subsequent reclamation associated with cashing U.S. money orders constitutes sufficient consideration. *See, e.g., Am. Fed. Bank v. United States*, 62 Fed. Cl. 185 (2004) (finding that a bank gave consideration when it agreed to await the government's review of its modified conversion applications in return for a longer amortization period); *OAO Corp. v. United States*, 17 Cl. Ct. 91, 103 (1989) (finding that a contractor gave consideration when beginning work on a project for the government with the anticipation that he would be awarded the contract).

Finally, the Amended Complaint identifies Jayne Schwarz as the Postal Service representative who was authorized to ratify the agreement with the Exchange Houses. As noted above, Schwarz was in a management position at the Postal Service, she authored letters memorializing the agreement between the parties, and she wrote the September 1999 letter denying the Exchange Houses' contract claims. *See* Am. Compl. ¶¶ 70, 74, 76, 87; Letter from Jayne Schwarz (Sept. 24, 1999) (Exhibit C). At this stage of the proceedings, the Exchange Houses are therefore entitled to the inference that Schwarz had authority to bind the Postal Service.

In its Motion to Dismiss, the Postal Service argues that a contract never formed because there was no meeting of the minds. *See* Gov't Mot. Dismiss 20-24. The question of whether there was a meeting of the minds, however, is an intensely fact-specific question that is ill-suited

for resolution at the pleading stage. *See Texas Instruments, Inc. v. United States*, 922 F.2d 810, 815 (Fed. Cir. 1990) ("Whether a legally enforceable contract has been formed by a meeting of the minds depends upon the totality of the factual circumstances."). Contrary to the standard of review and other binding precedent, the Postal Service asks this Court to resolve those factual disputes on a motion to dismiss *and* in its favor. That is improper at this stage of the proceedings.

In any event, the Amended Complaint adequately pleads a meeting of the minds. The language in the letters that the Postal Service claims "clearly contradict the notion of a meeting of the minds" (Gov't Mot. Dismiss 20), is undermined by *other* language in those letters that demonstrates that the parties, in fact, *did* reach a definite agreement. For example, the Amended Complaint lists several categories of actions that the Postal Service agreed to undertake, and Jayne Schwarz's January 14, 1998 letter summarizes each of those promises. *Compare* Am. Compl. ¶ 69 *with* Letter from J. Schwarz to M. Abreu & J. Schabes (Jan. 14, 1998) (Exhibit B). Further, Schwarz confirms in that same letter that the Postal Service "agreed in our [December 10, 1997] meeting to work on" those issues. *See* Letter from J. Schwarz to M. Abreu & J. Schabes (Jan. 14, 1998) (Exhibit B). To the extent that there is any conflict in the correspondence, at this stage of the proceedings the Court cannot resolve those ambiguities in the Postal Service's favor. *See Buesing*, 42 Fed. Cl. At 684 (stating that when evaluating a motion to dismiss for lack of jurisdiction, "the allegations of the complaint should be construed favorably to the pleader").

Although the parties held meetings after December 1997 and exchanged a variety of other correspondence, those meetings and letters addressed the details of how the Postal Service would fulfill the promises it made at the December 10, 1997 meeting, not *whether* it would abide

by those promises. Thus, it is not the case—as the Postal Service contends (Gov't Mot. Dismiss 21)—that the parties "deferred" their legal obligations until the execution of a written document. Once the Exchange Houses accepted the Postal Service's offer by agreeing to resume cashing money orders, a binding contract existed based on the promises made at the December 10, 1997 meeting. There was no obligation to reduce the parties' otherwise clear and definite terms to an express contract. *See Total Med. Mgmt*, 104 F.3d at 1319 (finding that plaintiff pleaded the existence of a valid implied contract after examining the parties' conduct and the documents exchanged between them); *Brunner v. United States*, 70 Fed. Cl. 623, 647-49 (2006) (finding that an implied contract existed after examining the parties' statements and conduct); *Advanced Team Concepts, Inc. v. United States*, 68 Fed. Cl. 147 (2005) (finding that the parties' conduct demonstrated that the plaintiff had an implied contract with the Government).

Likewise without merit is the Postal Service's claim that the terms of this contract are too nebulous to be enforced. *See* Gov't Mot. Dismiss 22-23. The terms of the agreement are set forth in paragraph 69 of the Amended Complaint, and Jayne Schwarz's January 14, 1998 letter confirms those terms. Thus, this is not a case where this Court "'will be put to an undue burden of figuring out what the parties would have agreed to had they completed their negotiations.'" Gov't Mot. Dismiss 22 (quoting *Goldstick v. ICM Realty*, 788 F.2d 456, 461 (7th Cir. 1986)). The "essential terms" (*id.*) of the agreement were clear: the Postal Service promised to undertake the listed actions and, in return, the Exchange Houses agreed to resume cashing money orders. *See* Am. Compl. ¶ 69. The remaining negotiations between the parties addressed how—not whether—the Postal Service would undertake those actions. In the end, however, the Postal Service refused to abide by any of the promises made at the December 10, 1997 meeting. There

is, therefore, an adequate basis for this Court to determine whether the Postal Service breached its agreement.

Equally specious is the Postal Service's claim that the Amended Complaint's use of the term "Pilot Program" somehow "inherently indicates that it is a program to be tried on a limited time basis" and that therefore "there was not a *bona fide* contractual agreement, but rather a simple series of discussions." Gov't Mot. Dismiss 21, 23. It was Jayne Schwarz – not the Exchange Houses – who first described the agreement as a "pilot . . . program" in her September 24, 1999 letter terminating the contract. *See* Letter from J. Schwarz to J. Abel & R. Rodriguez (Sept. 24, 1999) (Exhibit C). The Amended Complaint merely quotes her characterization of the contract as further evidence of the Postal Service's bad faith. *See* Am. Compl. ¶¶ 87, 100. It is clear from the face of the Amended Complaint that the Exchange Houses have never adopted Schwarz's implication that the parties had entered into "a limited time basis" pilot program.

In sum, the Amended Complaint sets forth each of the elements of the Exchange Houses' contract with the Postal Service in sufficient detail to withstand a motion to dismiss. This Court should therefore deny the Postal Service's motion.

## V. CONCLUSION

The Court should reject the Postal Service's jurisdictional arguments in their entirety. The Court should conclude either that the Exchange Houses have satisfied the CDA's jurisdictional requirements or that the CDA does not apply here and transfer this case back to the District Court. The Court should likewise reject the Postal Service's sovereign-capacity argument because the Postal Service was clearly acting in a proprietary capacity when it entered into the collaborative contract with the Exchange Houses. Finally, the Court should otherwise deny the motion to dismiss because the Amended Complaint adequately pleads a contract with the Postal Service.

Respectfully submitted,

______________________________

Howard G. Slavit
DC Bar No. 962886
SAUL EWING LLP
2600 Virginia Avenue, N.W.
Suite 1000 – The Watergate
Washington, DC 20037-1922
(202) 333-8800 (tel.)
(202) 337-6065 (fax)

Mark C. Cawley
DC Bar No. 468611
SAUL EWING LLP
3800 Centre Square West
1500 Market St.
Philadelphia, PA 19102
(215) 972-1887 (tel.)
(215) 972-2298 (fax)

Dated: October 20, 2006

*Counsel for the Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss was served this day by first class mail, postage prepaid, upon:

Doris S. Finnerman, Esquire
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

________________________________
Howard G. Slavit
Attorney for Plaintiffs

Dated: October 20, 2006