IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ARBITRAJE CASA DE CAMBIO, S.A. DE CV., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 05-217C |
| | ) | (Senior Judge Smith) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims, defendant respectfully replies to the opposition to our motion to dismiss filed by plaintiffs, Arbitraje Casa de Cambio, S.A. DE CV., et al. (collectively "the Exchange Houses").

Our statement of facts appears in full in our motion to dismiss. Briefly, the United States Postal Service ("USPS") issues postal money orders that are purchased by individuals and made payable to others. To actually get paid the amount of the money order, institutions like the Exchange Houses guarantee the authenticity of the payee and then present the information to the paying bank. See Domestic Mail Manual ("DMM") S020.3.3. USPS is not held accountable when financial depository institutions (like the Exchange Houses), who are in the best position to detect fraud by verifying the identity of an endorser, fail to properly authenticate an endorsement. Indeed, USPS has the authority to examine orders for payment and to reclaim, or obtain a refund of the amounts of paid money orders. DMM §§ S0202.3.1(d), S202.3.2, S020.3.4.[1]

---

[1] The reclamation process is described in detail in our motion to dismiss. Mot. at 2-4. Ultimately, after all of the required steps have been taken, the USPS may retrieve the original money order and compare the signatures of the purchaser and intended payee on the Form 306 with the signatures on the original money order. If the signatures appear to be the same, the claim is denied. If the signatures do not match and the USPS concludes that the money order was not cashed by either the purchaser or the intended payee, the USPS sends a money order in the same amount to the original purchaser. At the same time that it sends payment to the original

Here, the Exchange Houses allege that USPS owed them approximately nine million dollars arising from their negotiation of USPS money orders that were later found to contain forged endorsements. The Exchange Houses filed a complaint in the United States District Court for the District of Columbia, seeking to compel USPS to pay them the contested amount. The court granted the Government's motion to dismiss holding that plaintiffs "have no claim against the government in any action based on postal money orders;" that plaintiffs' only claim on the money orders was against their presenting banks. See Arbitraje Casa de Cambio v. United States Postal Service, 297 F. Supp. 2d 165, 169 (D.D.C. 2003); see also Casa de Cambio Comdiv S.A. de C.V. v. United States, 291 F.3d 1356, 1366 (Fed. Cir. 2002) ("The depositer [sic] [plaintiff], unlike the presenting bank, has no claim against the United States").

After raising a new issue in the briefing of the Government's motion to dismiss, the Exchange Houses filed an amended complaint in district court alleging that they had engaged the USPS in a series of meetings which, according to the Exchange Houses, constitute "express contracts with the USPS, whereby the Exchange Houses would continue to accept USPS money orders and the USPS would reimburse the Exchange Houses for certain reclamations." Arbitraje, 297 F. Supp. 2d at 170. On November 30, 2004, the court found that the contract alleged by plaintiffs was subject to the Contract Disputes Act ("CDA"), and, accordingly, it did not possess subject matter jurisdiction over this claim. The case was transferred to this Court. Arbitraje

---

purchaser, the USPS seeks to reclaim that amount from the bank which presented the fraudulently endorsed money order to the Federal Reserve Bank. After the presenting bank is identified, the USPS sends a copy of the money order, the executed Form 306, and an invoice requesting payment. When the USPS reclaims the money from the presenting bank, the bank may then debit the account of the Exchange House which presented the falsely endorsed money order to it for payment. See Tewani Imports, Inc. v. Norwest Bank, N.A., 139 F. Supp. 2d 805, 808-09 (S. D. Tex. 2001).

Casa de Cambio v. United States Postal Service, 2004 WL 3257073 (D.D.C. 2004). Accordingly, the only claim before this Court is a claim that a series of meetings between the Exchange Houses and the USPS constituted an enforceable contract, which was breached.

The Exchange Houses' contract claim relies upon a series of meetings between Exchange House executives and USPS.[2] The Exchange Houses allege that the economic crisis in Mexico in the 1990s resulted in "widescale fraud with respect to stolen or forged money orders," Amended Comp. at ¶ 48, which, in turn, lead to reclamations by USPS. Id. at ¶ 52. The Exchange Houses allege that they then refused to honor USPS money orders but attempted to engage in negotiations with USPS to alleviate the problem. Specifically, the complaint alleges that four meeting between USPS and the Exchange Houses occurred between December 1997 and February 1998. These meetings, the details of which are explained in our motion to dismiss, are memorialized by either letter or memoranda/minutes. Exh. A-D of Mot. to Dismiss. Plaintiffs contend that these letters reflect the existence of an agreement between USPS and the Exchange Houses by which USPS would reimburse the Exchange Houses for reclamation charges. Amended Comp. at ¶ 80-81. The Exchange Houses allege that USPS then breached this agreement, resulting in approximately nine million dollars in damages. Id. at ¶¶ 104-07.

[2] As we stated in our motion to dismiss, for purposes of our motion to dismiss, we will treat the allegations of plaintiffs' complaint as true. If our motion is denied, we reserve the right to contest each and every allegation in the complaint.

I. The Court Lacks Jurisdiction To Entertain The Complaint

A. USPS Issues Money Orders In Its Sovereign Capacity

Contrary to the Exchange Houses' contention, Pl. Opp. at 14-17, when USPS issues money orders pursuant to its statutory authority, it does so only in its sovereign capacity and, because the Exchange Houses have failed to alleged that a contract pursuant to USPS's sovereign power existed, this Court lacks jurisdiction. The Exchange Houses contend that, because any commercial entity, such as Western Union, can enter into an agreement such as the one alleged in the complaint, the agreement is not unique to USPS and, therefore, not entered into in USPS's sovereign capacity. Pl. Opp. at 14 (citing Stovall v. United States, 71 Fed. Cl. 696, 698 (2006)). However, the Exchange Houses' contention bypasses the uniquely sovereign capacity in which USPS issues money orders in the first instance. In other words, assuming for purposes of argument, that the agreement occurred, the question whether the agreement arises out of USPS's sovereign capacity or out of some commercial capacity is necessarily informed by whether USPS's issuance of money orders arises out of its sovereign capacity.

To that end, the Exchange Houses have failed to distinguish those cases in which other courts have correctly characterized USPS's money order system. As we demonstrated in our motion to dismiss, when the USPS issues money orders, it "exercises a governmental function" and "stands in its position of sovereignty" — it is not a commercial transaction. Bolognesi v. United States, 189 F. 335, 336 (2d Cir. 1911). As explained in Bolognesi, in 1872, Congress established a money order system to be administered by the USPS "'[t]o promote public convenience, and to insure greater security in the transfer of money through the mail'" (citing Rev. St. Sec. 4027, U.S. Comp. St. 1901, p. 2741). United States v. Northwestern Nat. Bank &

Trust Co., 35 F. Supp. 484 (D. Minn. 1940), expanded upon the conclusion that the postal money order system was a sovereign function:

> While the growth of the money order system may have assumed some aspects of commercial banking, it must nevertheless by characterized as a function of sovereignty and not a commercial operation. The operation of the post office system, with its many innovations inaugurated to meet a great public need, does not divest it of its character of sovereignty. When postal money orders are issued, the primary object is to further the safety of the postal system; to insure the sanctity of the mails from loss and theft which more frequently occurs when currency is transmitted through the mails.

35 F. Supp. at 486. See also Stewart v. United States, 300 F. Supp. 1047, 1049 (E.D. Mich 1969) ("The operation of the postal money order system is a 'sovereign function' and not a 'commercial operation', notwithstanding it may have some aspects of commercial banking"); but see United States v.. First Nat'l Bank of Boston, 263 F. Supp. 298, 302 (D. Mass. 1967) (distinguishing Bolognesi and Northwestern and stating that the modern postal money order system is less isolated from commercial activity).

Contrary to the Exchange Houses' contention, Bolognesi, Northwestern, and Stewart, all discuss the essential sovereign function of the USPS money order system. That, for example, Bolognesi goes on to conclude that the sovereign capacity in which money orders are issued then affects whether the order is a negotiable instrument, does not negate the conclusion that money orders are issued in USPS's sovereign capacity. Indeed, Arbitraje must concede that, although any institution that issues money orders can enter into a contract with its guarantors to govern their relationship, those institutions cannot provide the safety and security provided by the USPS system. The USPS money order system is governed by statute and regulation and provides for

unique remedies that benefit the public interest in a safe and reliable money order system. 39 U.S.C. § 101; 39 C.F.R. § 111.1; 39 C.F.R. § 20.1 (incorporating the DMM which provides USPS with authority to, among other things, examine money orders presented and issue reclamations). Private institutions are not governed by the same set of regulations and cannot, therefore, be said to provide the same service or oversight to the public. Therefore, USPS's issuance of money orders is unique and, contrary to the Exchange Houses' contention, cannot be performed by private entities.

B. The Complaint Does Not Meet The Requirements For Contracts Entered Into In USPS's Sovereign Capacity

Because USPS issues money orders in its sovereign capacity, any alleged contract entered into between USPS and the Exchange Houses is directly related to USPS's authority to issue money orders and is, therefore, also entered into in USPS's sovereign capacity. As such, the alleged contract must reflect an "unmistakable promise to subject the United States to monetary liability," to meet the jurisdictional requirements of this Court. Sanders v. United States, 353 F.3d 1329, 1336 (Fed. Cir. 2001) (emphasis added). Here, the series of communications between USPS and the Exchange Houses cannot be reasonably read to reflect an "unmistakable promise." For reasons that will be discussed more fully below, the communications between the parties evidence a negotiation process that remained tentative and ultimately, incomplete. See Ex. A-D to Mot. to Dismiss (discussing how discussions were a "good start," that the parties "agree to examine" the problems, that "further clarification" is necessary, and that an official "instrument" to bind the parties was necessary).[3]

[3] The alleged contract must also be entered into by someone with authority to bind the Government to pay money damages. Kania v. United States, 227 Ct. Cl. 458, 650 F.2d 264, 268

It is also worth noting that plaintiffs' original suit in district court addressed the true core of its claim — its contention that it should be reimbursed for certain reclamations. As we demonstrated, to the extent that those claims arose under USPS regulations, they have been adjudicated by the district court. In other words, the Exchange Houses were not without remedy — they were simply unhappy with the district court's decision.

C. Alternatively, The Complaint Fails To Meet The Requirements Of The CDA

The Exchange Houses continue to challenge the district court's holding that the breach of contract claim falls under the CDA, arguing that the alleged contract is not one for services such that the CDA would apply. Pl. Opp. at 11-14. Specifically, the Exchange Houses attempt to convince the Court that the alleged agreement was collaborative — ostensibly to escape the CDA's requirements that plaintiffs have submit a claim with the agency within the statute of limitations. However, the Exchange House can neither demonstrate that its alleged contract falls outside the CDA nor can it demonstrate that it fulfills the requirements of the CDA.

The Exchange Houses' contention that its agreement was a "collaborative" contract outside the CDA ignores the ultimately contractual nature of the alleged relationship between the parties and misapplies the analysis articulated by the Court of Appeals for the Federal Circuit in Institut Pasteur v. United States, 814 F.2d 624, 628 (Fed. Cir. 1987) . Pl. Opp. at 13.[4]

---

(1981). The Exchange Houses failure to demonstrate that anyone with authority entered into the alleged contract will also be discussed more fully below.

[4] The Exchange Houses' citation of Institut Pasteur and other cases concerning collaborative contracts are fundamentally distinguishable from this case. For example, the contract in Institut Pasteur involved the exchange of information and perishable biological products. The Court of Appeals for the Federal Circuit held that time-sensitive scientific collaboration regarding AIDS drug research "should not be required to await compliance with procurement regulations . . . ." 814 F.2d at 628. Here, the alleged contract is not sensitive in

Specifically, the question whether a contract procures services requires the Court to determine whether, among other things, the parties took on buyer/seller roles and whether the alleged contract required the Government to expend funds. 814 F.2d at 628. Here, the Exchange Houses concede that the alleged contract would have required it to take certain steps to minimize the incidence of money order fraud. See Amended Comp. at ¶ 81; Exh. A-D of Mot. to Dismiss. This constitutes a service provided to USPS so that USPS may better execute its money order authority. Most importantly, the alleged contract imposes a specific monetary burden upon USPS. Assuming, for purposes of argument only, that the contracts terms are as alleged, USPS would have had to reimburse the Exchange Houses for sums certain reclaimed by USPS. The procurement of service combined with USPS's alleged promise to refund make up the pieces of a CDA contract.

In any event, as we demonstrated in our motion to dismiss, the Exchange Houses failed to comply with the requirements of the CDA by failing to make a claim with the contracting officer. This Court lacks jurisdiction to entertain contract claims subject to the CDA unless there is both a valid claim and a contracting officer's final decision on that claim. James M. Ellett Const. Co., Inc. v. United States, 93 F.3d 1537, 1541-42 (Fed. Cir. 1996). To the extent that the Exchange Houses allege that USPS's Sept. 24, 1999 letter is the agency's final decision for CDA purposes, Pl. Opp. at 10, the Exchange Houses' complaint falls outside the statute of limitations. The CDA requires that appeals from final decisions must be made within 12 months of the final decision. 41 U.S.C. § 609(a)(3). Here, the alleged final decision is dated September 24, 1999 and the

---

nature and there is, thus, no reason why plaintiffs could not reasonably comply with procurement regulations.

Exchange Houses filed their complaint in district court in April 2002, well after the 12-month statute of limitation period. Therefore, the complaint fails to comply with the CDA's jurisdictional requirements.

Finally, the Exchange Houses' request for transfer is unavailing. As we have demonstrated, the district court has already held that it lacks jurisdiction to entertain the contract claim raised in the complaint. Of course, this does not prevent this Court from determining its own jurisdiction. Hoch v. United States, 31 Fed. Cl. 111, 113 n. 1 (1994)). Nevertheless, the district court's holding renders transfer back to district court futile. Schnelle v. United States, 69 Fed. Cl. 463, 465 n.4 (2006) ("A case should not be transferred to a district court if it most probably would be a futile act.") (citations omitted).

D. The Complaint Fails To Allege Sufficient Facts To Demonstrate The Existence Of A Contract

As we demonstrated in our motion to dismiss, regardless of the type of contract alleged, a plaintiff must demonstrate "a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." Total Med. Mgmt., Inc. v. United States, 104 F.3d 1314, 1319 (Fed. Cir. 1997). To state a claim upon which relief can be granted, plaintiffs must allege facts, which if proven, would permit plaintiffs to prevail under either an express or implied contract theory, and breach of that contract. Trauma Service Group v. United States, 104 F.3d 1321, 1325-27 (Fed. Cir. 1997).

Here, the complaint fails to demonstrate any mutual intent. Indeed, all the Exchange Houses have offered in their opposition brief are instances in which the parties acknowledged

that, despite the progression of negotiations, no final agreement had yet been reached. Most notable among these examples (explained in detail in our motion to dismiss) is the February 1998 meeting. According to the Exchange Houses, the resumption of cashing USPS money orders indicates acceptance of an alleged offer. Pl. Opp. at 19. The Exchange Houses fail to note that the minutes of this meeting state:

> [a]ll the CEOs confirmed their willingness to buy Money Orders again, provided that there should exist an instrument that makes official all the agreements reached. Therefore, upon execution of such a document they will reinitiate the purchase of Money Orders.

Ex. D, Mot. to Dismiss (emphasis added). This statement undermines completely the Exchange Houses' allegation that an offer was accepted during this meeting. Indeed, the statement indicates the opposite. In other words, the Exchange Houses were awaiting a written agreement before they resumed cashing money orders again. If the Exchange Houses changed their position and determined to resume business with USPS, they did so at their own risk. They cannot contend, on the one hand, that they required a contract before they would perform their services and, on the other hand, that they believed the February 1998 meeting to have resulted in a contractual commitment that bound the parties.

Similarly, the Exchange Houses have not identified any offer from USPS. They claim that their first meeting with USPS, in December 1997, resulted in a binding offer by USPS. Pl. Opp. at 18-19. However, again, the Exchange Houses fail to acknowledge that USPS's memorialization of that meeting states that the meeting was a "good start to finding solutions," and that USPS "agree[s] that we need to have a letter of intent to outline the parameters of our working group." Exh. A to Motion to Dismiss. Indeed, the Exchange Houses' own articulation

of the alleged promises made by USPS reveals the tentative nature of what were, in fact, early negotiations. Specifically, the Exchange Houses characterize the Postal Services alleged promises as promises only to "take steps" to perform certain actions. Pl. Opp. at 16.

Accordingly, the Exchange Houses are unable to demonstrate that any meeting of the minds occurred or that the alleged contract provides a definite statement of the parties' obligations. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 202 (Fed. Cir. 1992) ("In the absence of contractual intent or sufficiently definite terms, no contractual obligations arise"). Contrary to the Exchange Houses' contention, Pl. Opp. at 21, there is no practical way to discern or quantify what actions USPS agreed to take to comply with the "contract" terms, particularly when USPS has merely stated that it intended to "work on" certain issues.

Finally, the Exchange Houses are wholly unable to demonstrate that anyone with authority entered into the alleged contract. The Supreme Court has warned of the risks associated with contracting with the Government. "Anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation . . . ." Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947). This "admonition is firmly grounded in the public policy goal of protecting the public treasury from depletion by claims brought pursuant to unauthorized government contracts." Flexfab LLC v. United States, 424 F.3d 1254, 1260 (Fed. Cir. 2005). A party seeking to contract with the Government "can abate the risk by taking particular care to insure that it negotiates with a government agent whose status is that of a 'contracting officer.'" Id. citing 48 C.F.R. § 2.101.

Here, the Exchange Houses have not alleged that Jane Schwarz, manager of Corporate Accounting, possessed actual authority akin to the authority of a contracting officer. All the Exchange Houses allege is that she was present at some meetings and authored some letters. These facts are insufficient to allege actual authority. Further, the Exchange Houses have not (and, indeed cannot) identify any statute or regulation granting Ms. Schwarz or anyone holding her position, to enter into contracts and obligate the payment of money on behalf of USPS. Accordingly, because the Exchange Houses have not alleged sufficient facts to demonstrate that an individual with actual authority to bind the Government, entered into the alleged agreement, this Court lacks jurisdiction to entertain the complaint.

In any event, the Exchange Houses have failed to demonstrate how the alleged contract "clearly and unmistakably subjects the government to monetary liability for any breach." Awad v. United States, 301 F.3d 1367, 1375 (Fed. Cir. 2002). As we have demonstrated, the correspondence between USPS and the Exchange Houses and the minutes of meetings between the two establish only that the parties were attempting to solve a particular problem but had not yet agreed upon how best to do so. Accordingly, these documents are not nearly specific enough to subject the Government to any particular monetary liability.

## CONCLUSION

For these reasons, we respectfully request that the Court dismiss plaintiffs' complaint for lack of jurisdiction. If the Court finds that it does possess subject matter jurisdiction to entertain plaintiffs' claim, we respectfully request that this Court dismiss the plaintiffs' complaint for failure to state a claim upon which relief may be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Mark A. Melnick
MARK A. MELNICK
Assistant Director

Of Counsel
GARY SHAPIRO
Senior Litigation Counsel
United States Postal Service

s/ Claudia Burke
CLAUDIA BURKE
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Department of Justice
Tel: (202) 353-9063
Fax: (202) 514-7965

January 3, 2007

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 3d day of January 2007, I filed electronically this "DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS", service of which will be electronically delivered to:

Howard G. Slavit
Saul Ewing
2600 Virginia Ave. N.W.
Washington, D.C. 20037

s/ Claudia Burke