# In the United States Court of Federal Claims

Case No. 05-217C
FOR PUBLICATION
Filed November 19, 2007

* * * * * * * * * * * * * * * * * * * * * *

**ARBITRAJE CASA DE CAMBIO, S.A. DE CV., et al.,**

*Plaintiffs*,

v.

**THE UNITED STATES**,

*Defendant*.

* * * * * * * * * * * * * * * * * * * * * *

12(b)(1); 12(b)(6); Motion to Dismiss; Sovereign Immunity; Tucker Act; Contract Disputes Act; Transfer; United States Postal Service Money Orders; 28 U.S.C. § 1491(a)

*Howard G. Slavit*, Saul Ewing LLP, Washington, D.C., for Plaintiffs.

*Peter D. Keisler*, with whom were *David M. Cohen*, Director, *Mark A. Melnick*, Assistant Director, and *Claudia Burke*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, for Defendant.

## OPINION

SMITH, Senior Judge:

## I. Introduction

This case involves a contract dispute between several Exchange Houses in Mexico and the United States Postal Service ("USPS"). During a financial crisis in Mexico beginning in 1995, there was a surge in U.S. money-order fraud in Mexico. As a result of this fraud, the Exchange Houses began losing money due to the sharp rise in refund demands. This led the Exchange Houses to cease purchasing USPS money orders. The Mexican Exchange Houses now bring suit against the United States Post Office claiming that the Exchange Houses had a contractual relationship with the USPS as a result of those discussions, and that the USPS breached its obligations under that contract.

The Court has heard arguments in support of Defendant's Motion to Dismiss and Plaintiffs' counter-arguments thereto. After careful consideration, and for the reasons set forth in this opinion, the Court hereby **DENIES** Defendant's Motion to Dismiss.

## II. Background

### A. The USPS Money Order System

The USPS issues postal money orders made payable by the purchaser to a person or specific entity. The Domestic Mail Manual ("DMM") and International Mail Manual ("IMM") specify the procedures that the USPS follows in paying, refunding, and reclaiming money orders. *See* D. Mot. Dismiss at 2. The DMM and IMM are incorporated by reference into the U.S. Code of Federal Regulations. 39 C.F.R. § 111.1; 39 C.F.R. § 20.1. All money orders are forwarded through the Federal Reserve Banking System, to which commercial banks have access. Am. Compl. ¶ 27.

#### 1. The USPS Money Order System in Mexico Prior to 1997

A large volume of international USPS money orders issued in the United States have been directed to Mexico, designating Mexican citizens as payees, as many Mexican-Americans send money to relatives living in Mexico. As part of their regular business operations before 1997, Mexican Exchange Houses purchased USPS money orders for a fee from payees residing in Mexico, who then endorsed the money orders over to the Exchange Houses. *Id.* at ¶ 46. After purchasing a money order from a payee, the Exchange Houses forwarded the money orders to their U.S. partner banks, with whom the Exchange Houses had contractual arrangements. *Id.* at ¶ 47. The stateside banks presented the money orders to the Federal Reserve Bank for credit, and then credited the Exchange Houses' accounts for the value of the money orders. *Id.* The Federal Reserve Bank then forwarded the instrument to the USPS for payment and credited the accounts of the U.S. partner banks in that amount.

#### 2. Processing Lost or Stolen USPS Money Orders

A purchaser who believes that a money order has been lost may submit a claim to the USPS through a three-step process, adding two additional steps if the customer believes the money order was stolen as follows: (1) the purchaser presents the money order receipt to any post office and receives a "request for information," Form 6401; (2) the purchaser and the intended payee both sign the Form 6401 under penalty of perjury and submit it to the USPS; (3) if the money order has been cashed, the USPS notifies the customer and sends him or her a copy of the front and back of the money order; (4) if the customer believes that someone other than the intended payee cashed the money order, he or she notifies the USPS; (5) after notification, the USPS sends the customer a claim for alleged incorrect payment, Form 306, which the purchaser and intended payee both sign under penalty of perjury, and submit it to the USPS. D. Mot. Dismiss 3.

Upon receipt of a properly completed Form 306, the USPS retrieves the original money

order, comparing the signatures of the purchaser and intended payee on the Form 306 with those signatures on the original money order. If the signatures appear on their face to be the same, the claim is denied. If the signatures do not match and the USPS concludes that the money order was not cashed by either the purchaser or intended payee, the USPS issues a money order in the same amount to the original purchaser. The USPS then seeks to reclaim that amount from the stateside bank that presented the fraudulently endorsed money order to the Federal Reserve Bank. After the presenting bank is identified, the USPS sends a copy of the money order, the executed Form 306, and an invoice requesting payment. When the USPS reclaims the money from the presenting bank, the bank may then debit the account of the Exchange House which presented the fraudulently endorsed money order to it for payment. *See Tewani Imports, Inc. v. Norwest Bank, N.A.*, 139 F. Supp. 2d 805, 808 (S.D. Tex. 2001) (describing, generally, the process of clearing money orders).

## **III. Facts**

Plaintiffs describe a proliferation of fraudulent claims on USPS money orders precipitated by an economic crisis in Mexico beginning in 1995 (the "tequila crisis"). *See* Am. Compl. ¶ 48. Fraud was widespread and involved large numbers of forged money orders and fraudulent purchaser affidavits (Form 306). Throughout 1996 and 1997, the Exchange Houses began to receive notifications from their respective partner banks in the U.S. that their accounts had been debited as a result of reclamations by the USPS. The Exchange Houses claim losses from the reclamations are in excess of $8.9 million, based on the face value of money orders. Am. Compl. ¶ 60. Due to the losses, Plaintiffs ceased purchasing USPS money orders altogether in November 1997. *Id.*

The Exchange Houses and the USPS met together on four occasions to discuss the issues surrounding the purchase of USPS money orders. *Id.* at ¶¶ 65-74. The first meeting took place in Mexico City on November 25, 1997. *Id.* at ¶ 65. Plaintiffs allege that the USPS representatives present at that meeting "concurred with the necessity of clarifying or further investigating all reclamations to determine under what circumstances refunds would be proper or should otherwise be refused." *Id.* at ¶ 68.

The second meeting occurred on December 10, 1997, in Washington, D.C. *Id.* at ¶¶ 69. Plaintiffs claim that at this meeting, the Exchange Houses presented a list of 48 "anomalies" found in the USPS reclamations, and further that the USPS agreed to a number of actions, primarily addressing procedures for processing money order claims. *Id.* Following that meeting, USPS representative Jayne Schwarz sent a letter dated December 23, 1997 to Manual Abreu and James Schables, President and Vice President of the Associacion Mexicana de Casas de Cambio. *Id.* at ¶ 75; Ex. A. USPS representatives Jayne Schwarz and James M. Parrott authored a second letter regarding the December 10 meeting, which is dated January 14, 1998. *Id.* at ¶ 76; Ex. B.

At the third meeting on January 21, 1998, in St. Louis, Missouri, representatives from the Exchange Houses met with USPS representatives to review the list of "anomalies" prepared by the Exchange Houses. Am. Compl. ¶ 71. Plaintiffs allege that at the meeting, the USPS representatives confirmed which points in the list of anomalies would provide a basis for reimbursing the Exchange

Houses for the reclamations. *Id.* In addition, Plaintiffs claim the USPS agreed that 17 of the irregularities on the reclamation list "would serve as a basis for either cancelling invoices directed to the Exchange Houses or actually reimbursing the money orders that had been previously paid." Finally, Plaintiffs set forth a series of proposals made at the January 21, 1998 meeting. *Id.* at ¶ 71. Minutes of this meeting were compiled. *See id.* at Ex. C.

The fourth meeting occurred on February 3 and 4, 1998, in Mexico City. *Id.* at ¶ 73. The alleged matters discussed at this final meeting included the results of the St. Louis meeting, reimbursement procedures, "watch and accept" procedures, and the drafting of a frame agreement for crediting accounts or for payment of past claims. *Id.* Plaintiffs also claim that at this meeting the participants entered into and ratified several previous "agreements," including one stipulating that reimbursements for the reclamations already made would proceed in various phases, with Phase One allowing claims based on certain points from the 'list of anomalies.'" *Id.* at ¶ 79. These "agreements," according to Plaintiffs, resulted in the Exchange Houses agreeing to resume purchasing USPS money orders. Once again, minutes of the meeting were compiled. Ex. D.

Plaintiffs now allege that the agreements reached during the series of meetings, combined with the correspondence and memoranda resulting from the meetings, constitute "the terms of the agreement between the Exchange Houses and the USPS regarding the USPS's reimbursement of the reclamation charges incurred by the various Exchange Houses." *Id.* at ¶ 80. Plaintiffs claim that the USPS never performed under the agreements allegedly reached at the series of meetings and as set forth in the resulting correspondence. *Id.* at ¶¶ 83, 86, 88.

## IV. Procedural History

In April 2002, Plaintiffs filed a complaint in the United States District Court for the District of Columbia, seeking to compel the USPS to pay the $8.9 million allegedly arising from their negotiation of USPS money orders later found to contain forged endorsements. Defendants filed a Motion to Dismiss or, in the Alternative, to Transfer. In December 2003, the District Court granted Defendants' Motion to Dismiss. *Arbitraje Casa de Cambio v. United States Postal Service*, 297 F. Supp. 2d 165 (D.D.C. 2003). The court held that Plaintiffs had "no claim against the government in any action based on postal money orders," and that Plaintiffs' only claim regarding the money orders was against their presenting banks. *Id.* at 169. *See also Casa de Cambio Comdiv S.A. de C.V. v. United States*, 291 F.3d 1356, 1366 (Fed. Cir. 2002).

In January 2004, Plaintiffs sought leave to file an amended complaint in the District Court, which was granted in February 2004. In November 2004, the court found that any such contract between the USPS and Plaintiffs would be subject to the Contract Disputes Act of 1978 ("CDA")[1], and thus was outside the subject matter jurisdiction of the district court. By court order, the case was transferred to this Court on February 14, 2005. *Arbitraje Casa de Cambio v. United States Postal*

[1] 41 U.S.C. §§ 601-613 (2007).

*Service,* No. 02-0777, 2004 WL 3257073 (D.D.C. Nov. 30, 2004).

Thereafter, Plaintiffs filed their complaint in this court alleging that the series of meetings between the Exchange Houses and the USPS constituted an enforceable contract, which the USPS breached and, therefore, the USPS is liable. In response, the Government filed a motion to dismiss pursuant to RCFC 12(b)(1) and 12(b)(6). Oral argument was held, and after careful review, the Court **DENIES** Defendant's Motion to Dismiss.

## IV. Motion to Dismiss

### A. Legal Standard

RCFC 12(b)(1) authorizes dismissal of a complaint when the Court lacks jurisdiction over the subject matter; and RCFC 12(b)(6) authorizes dismissal if, assuming the truth of all allegations, the complaint fails to state a claim upon which relief may be granted as a matter of law. In evaluating a motion to dismiss, the Court must accept all well-pled factual allegations as true and draw all reasonable inferences in the plaintiffs favor. *Ainslie v. United States*, 355 F.3d 1371, 1373 (Fed. Cir. 2004). Dismissal is appropriate whenever "it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

### B. The Contract Disputes Act Does Not Apply

The Government argues that this case is subject to the Contract Disputes Act, and that the Court should dismiss the case due to Plaintiffs' failure to obtain a contracting officer's final decision before filing a complaint. D. Mot. Dismiss 14. The Government urges the Court to conclude that the alleged contract was for the procurement of services and, therefore, bound by the CDA. D. Mot. Dismiss 13. The Government characterizes the alleged contract as an agreement by Plaintiffs to continue accepting and processing USPS money orders in exchange for reimbursements for reclamations already made.

First, it is important to note that it is the duty of a court to evaluate its own jurisdiction. *United States v. United Mine Workers*, 330 U.S. 258 (1947). So, even though this case was transferred by the District Court under the CDA, this Court must make its own determination whether the case is governed by the CDA. The CDA applies to all executive agency contracts for "(1) the procurement of property, other than real property in being; (2) the procurement of services; (3) the procurement of construction, alteration, repair, or maintenance of real property; or (4) the disposal of personal property." 41 U.S.C. § 602(a) (2007). The Court declines to adopt the holding of the District Court that the contract falls under the CDA. *Arbitraje Case de Cambio v. United States Postal Service*, 2004 WL 3257073 (D.D.C. 2004). It is clear to the Court that, with deference to the District Court and contrary to the Government's characterization, the alleged contract is not governed by the CDA.

The CDA does not apply to all government contracts; rather, it "is limited to express or implied contracts for the procurement of services and property and for the disposal of personal property." *Coastal Corp. v. United States*, 713 F.2d 728, 730 (Fed. Cir. 1983). Procurement is "the acquisition by purchase, lease or barter, of property or services for the *direct benefit or use* of the Federal Government." *New Era Constr. v. United States*, 890 F.2d 1152, 1157 (Fed. Cir. 1989) (emphasis in original). Here, assuming the alleged facts are true, the Government and the Exchange Houses entered into a contract whereby the Exchange Houses would resume cashing money orders in exchange for the Government's promise to repay the reclaimed money. The Exchange Houses cash the money orders on behalf of payees, and the USPS is not directly involved in the transaction. When a payee receives a USPS money order, it presents that document to an Exchange House, which purchases it for a fee. The payee endorses the money order over to the Exchange House, and the payee leaves with cash. The Exchange House then forwards the money order to its partner bank in the United States. The partner bank presents the money order to the Federal Reserve Bank for credit, and then credits the Exchange House's account for the value of the money order.

It is clear that the USPS receives a benefit from the Exchange Houses' roles in the postal money order system. The standard for CDA procurement contracts, however, states that the procurement of services must be "for the *direct benefit or use* of the Federal Government." *Id.* The Exchange Houses' role in the USPS money order system directly benefits the payees; the Exchange Houses, for a fee, convert the money order into cash for the payee. The role of the Exchange Houses as it relates to the Government is indirect. It takes one more step, the forwarding of the money order to the U.S. partner bank, for the Federal Government to again be engaged in the USPS money order process.

As the Court finds that the alleged contract is not for the "direct benefit or use" of the Government, this is not a procurement contract. *See Winstar Corp. v. United States*, 518 U.S. 839 (1996). Therefore, the CDA does not apply. However, even though the Court finds that the CDA does not apply, leaving the Court without jurisdiction under that statute, the inquiry does not end here. The jurisdiction of this court is also founded on the Tucker Act, and so the Court must next analyze the applicability of the Tucker Act.

**C. Tucker Act Jurisdiction Applies**

The Tucker Act grants jurisdiction to this Court over claims "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a). The Tucker Act, however, is a general grant of jurisdiction; it does not provide a substantive cause of action. 28 U.S.C. § 1491(a). The Plaintiff must point to a separate statute, constitutional provision, contract, or other source that provides a right to monetary damages. *See Khan v. United States*, 201 F.3d 1375, 1378 (Fed. Cir. 2000).

**1. Sovereign Immunity**

When the Government acts in its sovereign capacity, it is protected from liability absent an express waiver of sovereign immunity. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). However, not every contract entered into by the Government is within its sovereign capacity. With regards to Tucker Act jurisdiction, the Government may be sued "where the sovereign steps off the throne and engages in purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves." *Kania v. United States*, 650 F.2d 264, 268 (Ct. Cl. 1981).

The Government urges the Court to dismiss this case for lack of jurisdiction because the USPS was acting in its sovereign capacity. Presumably, the contractual arrangements made between the USPS and a foreign government would be the act of a sovereign, as such arrangements are specifically authorized by the Postal Reorganization Act (PRA).[2] The alleged arrangement here, however, is not with the government of Mexico but with private Mexican Exchange Houses, thus falling outside the scope of actions specified by the PRA.

This Court recognizes that in the past, postal money orders held a superior position to that of commercial money orders. Earlier cases holding that USPS issuance of money orders is a sovereign act were perfectly reasonable given the state of the commercial paper market at the time.[3] When postal money orders were issued by an agency of the government, and cashable only by that agency, the weight of governmental imprimatur served as a reassurance to the public that there was an element of security provided by the sovereign. That situation is, however, no longer the case due to statutory changes within the last half century and the expansion of private ventures into this area of commercial paper. The Court is unpersuaded that USPS issuance of money orders differs in any significant way from the issuance of money orders by private commercial businesses such as Western Union, Wells Fargo, or American Express.

The Court finds that the issuance of USPS money orders does not fall within the scope of a sovereign act. A postal money order payee may cash the money order at an Exchange House, not just at the post office. The USPS competes with other international money-transfer businesses, and it therefore has "stepped off the throne" in order to engage in the industry. As the Court finds that the USPS meetings with the Exchange Houses were in the Government's proprietary capacity and not its sovereign capacity, the unmistakability doctrine upon which Defendant relies is inapplicable. *Sanders v. United States*, 353 F.3d 1329, 1336 (Fed. Cir. 2001).

---

[2] 39 U.S.C. § 408: (PRA) "The Postal Service may make arrangements with other governments, with which postal conventions are or may be concluded, for the exchange of sums of money by means of postal orders. It shall fix limitations on the amount which may be so exchanged and the rates of exchange."

[3] *See Bolognesi v. United States*, 189 F. 335, 337 (2d. Cir. 1911); *Jaselli v. Riggs Nat. Bank*, 1911 WL 20066 (C.A. D.C. 1911); *United States v. Northwestern Nat. Bank & Trust Co.*, 35 F.Supp. 484 (D. Minn. 1940), and *United States v. Stockgrowers' Nat. Bank*, 30 F. 912 (C.C. Colo. 1887).

**2. Alleged Facts are Sufficient to Show a Contract May Exist**

In order to state a claim for breach of an implied-in-fact contract with the United States, a plaintiff must allege "a mutual intent to contract, including an offer, an acceptance, and consideration." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). In addition, the plaintiff must allege facts "sufficient to show that the government representative who entered into or ratified the alleged contract was authorized to bind the United States to the agreement in question." *Id.* Plaintiffs do not point to an express contract, but rather to a series of meetings which, taken together with correspondence and memoranda, "constitute the terms of the agreement between the Exchange Houses and the USPS regarding the USPS's reimbursement of the reclamation charges incurred by the various Exchange Houses." Am. Compl. ¶ 80.

The Government argues that Plaintiffs have not demonstrated a "meeting of the minds" and have not alleged that Jayne Schwarz possessed authority to enter into the alleged contract. D. Mot. Dismiss 11. However, in order to withstand a motion to dismiss, a plaintiff must allege facts which, if true, would prove the existence of a contract. The Federal Circuit has held that a general allegation of authorization, liberally construed from the facts alleged in a complaint, is sufficient to withstand a motion to dismiss. *Sommers Oil*, 241 F.3d at 1380. In *Sommers*, the Federal Circuit found that while the complaint was "rather indirect in the manner in which it sets forth" the allegation of authority, it was reasonable to infer from the allegations in the complaint that there were several people who could have had authority to act on behalf of the government. *Id.* at 1379. Similarly here, Plaintiffs have not clearly alleged that Jayne Schwarz, or any other USPS employee, had authority to enter into the contract. Still, construing the complaint liberally, as a motion to dismiss requires the Court to do, Plaintiffs have identified Ms. Schwarz as the USPS representative who had authority to ratify the agreement. Am. Compl. ¶¶ 70, 74, 76, 87. Plaintiffs allege that Ms. Schwarz was in a management position, that she authored letters to the Exchange Houses, made representations regarding the money available for refund, and wrote the 1999 letter denying the Exchange Houses' contract claims. P. Opp'n 19. Liberally construed, these claims can be taken together as an allegation that Ms. Schwarz had authority to contract on behalf of the government. Therefore, the Court finds that the facts allow the case to proceed further under the Tucker Act.

## V. Conclusion

The Court finds that this not CDA claim, that this Court has jurisdiction under the Tucker Act, and that the facts plead are sufficient to defeat the Motion to Dismiss. The Court further finds that the USPS was not acting in its sovereign capacity when dealing with the Exchange Houses and, therefore, sovereign immunity does not bar this claim. Furthermore, the complaint alleges facts which, if proven, would establish that USPS and the Exchange Houses had a contract and, therefore, this case may proceed. In light of this decision, the issue of transfer is **MOOT**.

For the reasons set forth above, the Court hereby **DENIES** Defendant's Motion to Dismiss. A status conference to establish a discovery and a briefing schedule will be scheduled by subsequent

order.

**It is so ORDERED**.

s/Loren A. Smith
LOREN A. SMITH
Senior Judge